# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **Plaintiff** | : | |
| | : | **CASE NO: 3:15-CR-0085** |
| **v.** | : | **(VLB)** |
| | : | |
| | : | |
| **ERIC LONERGAN and ZACHARY** | : | |
| **KRAMER, ET. AL.,** | : | |
| **Defendant** | : | **AUGUST 22, 2016** |

 

### DEFENDANT ERIC LONERGAN'S
### <u>MEMORANDUM IN AID OF SENTENCING</u>

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ..................................................................................1

II. FACTORS TO BE CONSIDERED IN IMPOSING AN
    "INDIVIDUALIZED" SENTENCE UNDER 18 U.S.C. § 3553(a) ......15

    A.  Nature of the Offense and History And Characteristics
        of the Defendant ..................................................................18

        1.  Eric's Childhood............................................................19

        2.  Eric's Departure from his Home and Family  In
            Brazil, Travel to Wesleyan, and Descent  into
            Severe Depression and Illness ....................................21

        3.  Dr. David Miller's Diagnosis of Bipolar Disorder
            (A Disease That Also Inflicted Eric's Father and
            Grandfather) Which, Coupled With Eric's
            Fascination  For and Interest In Neuroscience,
            Led to Eric's Severe Manic State and His
            Underlying Misconduct...................................................23

        4.  The Offense Conduct Was Aberrant, In Stark
            Contrast to Eric's Extraordinary Intelligence
            and Exemplary Character ............................................31

            a.  Eric's Wesleyan University Professors.............32

            b.  Eric's Friends, Peers, and Wesleyan
                Classmates .........................................................37

            c.  Eric's Mentor and Physician ..............................46

        5.  Eric's Cooperation With The Government .................48

        6.  Eric Has No Criminal History .......................................51

        7.  Eric's Youth and Family History .................................52

        8.  Eric's Extraordinary Growth and Rehabilitation........52

    B.  THE PURPOSES OF SENTENCING WOULD BE
        SATISFIED BY A NON-INCARCERATIVE,
        PROBATIONARY SENTENCE.............................................56

      **1.**      **As in the Recent Landmark Case of *United States v. Nesbeth*, the Collateral Consequences of Eric's Conviction Would Make An Incarcerative Sentence Unduly Excessive**................56

      **2.**      **The Factors Under 18 U.S.C. § 3553(a) Support a Non-Incarcerative, Probationary Sentence**................65

**C.**      **THE KINDS OF SENTENCES AVAILABLE**...........................71

      **1.**      **A Sentence of Probation with Home Confinement is Appropriate**........................72

      **2.**      **Support for Community Service Sanction**.................73

**D.**      **AVOIDING UNWARRANTED SENTENCING DISPARITIES**............................................................78

      **1.**      **Eric's Co-Conspirator Zach Kramer, Who Distributed the "Molly" that Led to the 2015 Hospitalizations, Received a Sentence of 4 Months in Prison and 8 Months Home Confinement**...............................................................78

      **2.**      **Other College-Aged Defendants Recently Convicted of Distributing "Molly" Received Non-Incarcerative Sentences**.....................................83

**E.**      **SENTENCING GUIDELINES**.................................................86

**F.**      **CONCLUSION: A SENTENCE OF PROBATION WITH STRINGENT SPECIAL CONDITIONS IS APPROPRIATE AND JUST UNDER THE CIRCUMSTANCES**........................86

## I.     INTRODUCTION

Defendant Eric Lonergan, through his undersigned counsel, respectfully submits this Sentencing Memorandum, to aid the Court in determining the appropriate sentence for him.

Eric is an extraordinarily-brilliant but fragile young man, who in his early 20's engaged in foolish, reckless, and dangerous behavior while a student at Wesleyan University.  He is also an unusually-kind, good, and gentle person.  Eric accepts full and complete responsibility for his illegal, dangerous conduct.  This Memorandum does not try to excuse that conduct.  Rather, its primary purpose is to explain it and, more specifically, to discuss (i) 18 U.S.C. § 3553(a)'s sentencing  factors, (ii) how these factors apply to Eric, and (iii) why these factors -- including (a) Eric's Bipolar Disorder, (b) his post-arrest transformation, including the extensive and important community service he has already rendered, and (c) *United States v. Nesbeth*, a recent, landmark "collateral consequences" case in which a defendant facing a guidelines sentencing range of 33-41 months in a drug case was sentenced to probation -- warrant leniency and a non-incarcerative sentence in this case.

Although undiagnosed until 2015, Eric has a history of acute depression and suffers from Bipolar Disorder (from which his father and grandfather also suffered). As his noted psychiatrist Dr. David Miller states, Eric's mental disorder and prolonged manic state caused his misconduct and his then-manic and delusional belief that by taking and selling "Molly" he was actually "helping" himself and his classmates. Ironically, and sadly, his naïve and delusional belief that he was "helping" was enhanced by his passion for neuroscience, *see infra* at page 23-31.[1]

In his late teens, while suffering from his own depression and witnessing his father Peter's crippling depression, Eric felt a burning desire to help himself, his father, his then-girlfriend (who was also clinically-depressed and suicidal), and others, by using his talent to

_____

[1] As Dr. Miller's Report provides, Eric's "wrongful conduct was indeed due to a severe mental disorder, which blocked his awareness of its illegal and dangerous aspects . . . . The specific form of his breakdown at Wesleyan, as is typical with manic episodes, reflected his underlying character, including his scientific brilliance and his altruism (I do not believe it is a coincidence that the underlying drug was an analogue to "MDMA" as opposed to, for example, crack cocaine), though his manic disorder grossly distorted his judgment." (*See* Report and CV of Dr. David Miller at 2, 6, copies of which are annexed hereto as Exhibit 1.)

find a "cure." He channeled his desire and intellect into an intense interest in neuroscience, for which he had a preternatural aptitude. Ultimately, he was accepted to Wesleyan University, where he struggled with his depression, which then escalated into an extended manic episode before tragedy hit.

Eric's personal attributes and characteristics include utter brilliance (as his Wesleyan University professors have independently attested), decency, altruism, kindness, and fragility. These are not mere platitudes. They are verbatim quotations from the forty-plus letters that are attached hereto as Exhibits.

By way of illustration, Eric's treating physician Dr. Miller writes that Eric's "underlying character" includes "<u>his scientific brilliance and altruism</u>." Dr. Miller also expresses his sincere belief that Eric "<u>has the capacity to make a major contribution to the field of psychoneuropharmacology, one that will enhance the well-being of countless people who [like Eric] suffer from mental illness</u>." (Ex. 1, at 7.)[2]

---

[2] Unless otherwise indicated, all emphases are added.

No less than five of Eric's Wesleyan professors similarly attest to Eric's intellect, work ethic, and almost-unique potential:

- "Eric is among a small handful of the most philosophically and scientifically talented students I have ever taught in my [39-year] career. He stands out even among that extraordinary group for his passion to understand the mind and his dedication to learning."

- "He has the ability and drive to go on to further study and make a significant impact as a scientist or scientifically informed philosopher, and as a teacher;"

- "He has extraordinary talent, and the kind of commitment to learning and engaging intellectually with others that is needed to succeed in these highly cooperative fields of inquiry and to guide and aid others effectively."

- "[H]is grades were high even among an overachieving elite college student body;" "Given his intellectual capacity, exacting work ethic, and abiding interest he would have a very bright career in the field of neuroscience;"

- "[P]otential as a great scholar" and "excellent candidate for neuroscience graduate school;" and

- "His attention to detail was incredible . . . and [h]e was also a highly ethical student in my class."[3]

Additional common themes running through the many annexed letters from Eric's supporters include his "amazing passion," as well

---

[3] *See* Letters of Wesleyan Professors John Rouse, Matthew Kurtz, John Kirn, Steven Horst, and Aaron Gloster, annexed hereto as Ex's 2-6, respectively.

as his "gentleness," "kindness," "enormous . . . desire to help others," and his immoderate "generosity."

Eric's childhood; his third-generation mental illness (which his father Peter describes as a "family curse"); his stunning intellect, work ethic, and altruism; and his other exemplary characteristics, are strong mitigating factors warranting a non-guideline sentence/post-*Booker* variance or substantial downward departure, based upon "individualized justice."  *See United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005), *abrogated on other grounds* in *United States v. Fagans*, 406 F.3[rd] 138, 142 (2nd Cir. 2005)).

There are several *additional* compelling and often-overlapping facts that further support leniency.

*First,* Eric has *already* demonstrated his ability to help society, performing extensive community service.  As his sponsors have attested, this service has been far from *pro forma*.  To the contrary, it has been important, consistent, and ongoing.  It has also been deeply meaningful to Eric, and to those whom he has served.  Given his gifts for teaching and speaking, as well as his altruistic traits, it has been a calling for Eric.  Eric's community service has been comprised of

several components, as further described below and in the accompanying letters. He performed extensive service at the "DC Central Kitchen," a Washington, D.C.-based hunger organization, which has done ground-breaking work in addressing homelessness and addiction. He has also served as a tutor at "For Love of Children" (or "FLOC"), a leading Washington, D.C. non-profit institution dedicated to helping underprivileged inner-city children with learning difficulties. (*See* Ex's 7, 8, and 21.)

Perhaps most significantly, Eric has committed to doing everything he can to deter others from making the same mistakes he did, in high school, college, or elsewhere. He has given a series of lectures about the dangers of drugs (synthetic or otherwise) to various schools and charitable organizations. In addition to promising high school students (like Eric once was), the audiences have been comprised of individuals with developmental, physical, or mental disabilities; homeless and other war veterans; ex-convicts; present or former alcohol and/or drug abusers; and young,

underprivileged, and underserved children and teenagers in the Baltimore, Maryland and Washington, D.C. area.[4]

Eric's lectures have been enthusiastically-received, and his sponsors have been profuse in their praise of Eric and his ability to connect with audiences. Indeed, they hope that Eric can continue this service indefinitely. Following are a few illustrations:

- "I truly think that his message will help many of our students understand that their lives are at risk if they succumb to the negative influences that surround them on a daily basis. Eric's effort might even keep some of them from taking that one wrong step that ends up putting them behind bars or worse."[5]

- I am aware of Eric's criminal situation that brings him before Your Honor for sentencing. It is precisely this experience that makes his presentation so valuable in our efforts to improve the lives of our individuals. He spoke of the horrible choices he made in getting involved in drugs, his deep regret for the harm he caused, and how he plans to use the perspective he gained in the process to prevent others from making the same mistakes."

- "Eric clearly has a talent for explaining complex issues in a way that is understandable for ordinary people, and even our [challenged] individuals are able to relate to his story

---

[4] *See* Ex's 19-21.

[5] Letter of Dr. Angela Chambers, Principal, Youth in Transition School, Baltimore, Maryland, Ex. 9.

and absorb his message.  I am certain that . . . his talk will influence our individuals in a positive way, and might even help save their lives."

- "I am convinced that if given the chance, he is going to continue to use his considerable talents to serve the community, and has taken this lesson to heart. [6]

Thus far, Eric has performed approximately 200 hours of community service.  In addition, in compliance with the terms and conditions of his release -- and despite the challenges of obtaining employment given the substantial publicity surrounding his arrest, indictment, and conviction (which are readily accessible to any prospective employer via a quick "GOOGLE" search) -- Eric has continually been employed as a retail associate with a GNC vitamin and supplements store.  After initially enduring four-hour daily commutes to and from work, he now works at a GNC store in Washington, D.C., where he is able to put his expertise in biology, nutrition, and neuroscience to good use.

*Second,* and relatedly, the silver-lining to this tragedy, if there is one, is Eric's recovery and transformation.  As Dr. Miller writes,

---

[6] Letter of Earl El-Amin, Vice President, Program Development, Adult Residential Program, National Center on Institutions and Alternatives, Ex. 10.

During therapy, Mr. Lonergan has made great, transformative, strides.  He has fully recognized that his judgment had been deeply impaired, that it was delusional for him to believe that selling drugs to his classmates, not for recreational use, but "medicinally" (to use his word) was a contribution to the "community of his fellow students."

Further, discussing Eric's employment and extensive community service activities, Dr. Miller writes that these

efforts have shown Mr. Lonergan for the first time in his life that he can gain recognition and self esteem by applying his deep interest in psychoneuropharmacology, an interest that long precedes his college years.  His aim since high school has been to get a Ph.D. in neuroscience and to help develop more effective, targeted treatments for behavioral disorders.

Eric's goal, as Dr. Miller states, is to make a "contribution to society" and he "feels confident that [Eric] will go on applying his talents toward the welfare of others."  Indeed, Eric

knows that his work in therapy is not completed; he is committed to further therapy to help him better manage the underlying issues that led to his psychiatric decompensation at college.  In the immediate future, he would like to continue with . . . community service, which he finds deeply meaningful, while figuring out how to resume his education and move toward a career in public service or medical science, if that is possible.

Channeling his expertise in biology, nutrition, and neuroscience, Eric is also working with a successful entrepreneur to create a

chocolate bar infused with safe, natural and, of course, legal, herbs, in an effort to create a more nutritious alternative to candy (and to mitigate negative aspects of caffeine addiction). Eric's partner in this endeavor is his mentor Majed Tomeh. As his attached letter describes, Mr. Tomeh, who holds degrees from Princeton, Stanford, and Harvard Business School, has been a successful, public service-oriented entrepreneur since 1985.

With regard to Eric's transformation, Mr. Tomeh writes:

Over the thirteen months that I've worked with Eric, since he left Wesleyan and moved to DC to be with his mother, I've seen him progress from a state of overwhelming and dark depression to a young adult coping constructively with the terrible situation into which he has placed himself, fellow students, and his immediate family.

He has turned himself around methodically: through therapy and exercise, but mostly, in my view, through his [employment and community service]. Today, through his own effort -- and though emotionally drained from thinking about what he has done -- Eric Lonergan is a very different person from the young man I met again in April 2015, who was then dark, despondent, in shock, and who had dug himself into a deep, deep hole. Most notable is his focus on helping others: students at schools who benefit from his insights into promoting their health; veterans who want more of his teachings about health and the brain; the boys he works with [at FLOC] who are finally able to work on math or play, thanks to him; and, at his core, the person who wants to save human beings from the afflictions of depression and anxiety.

**I find it nearly impossible to square \*this\* Eric Lonergan with the one who did what he did in the first semester of his senior year at Wesleyan. How often I have wished that I had been there with this young man, to offer him more positive guidance at a difficult time in his life, and to smack him on the side of the head for even thinking of doing what he did. At Wesleyan, himself depressed, in a college environment that had turned a blind eye to the widespread use of drugs for years, as a method of coping, Eric acted in a way that was terribly foolish, naïve, wrong, and brimming with youthful hubris. The Eric I have come to know could not have been acting from his <u>right mind</u> at Wesleyan. (emphases in original.) (Ex. 11.)**

*Third,* putting aside the torment, shame, and guilt Eric has suffered as a result of his conduct, arrest, expulsion, indictment, and conviction, as a matter of law, the collateral consequences Eric faces are severe. The importance of considering at sentencing the collateral consequences of *drug-related* convictions (which are particularly severe) was discussed in a recent, important Opinion by United States District Judge Frederic Block of the Eastern District of New York. *See United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073 (E.D.N.Y. May 24, 2016).

*Nesbeth* is a landmark Opinion. In that case, defendant Chevelle Nesbeth was charged with and convicted for possession with intent to distribute more than 600 grams of cocaine. Her sentencing

guideline range was 33-41 months (Level 20).  Nevertheless, although Judge Block referred to Ms. Nesbeth's crimes as "serious" and her criminal conduct "inexcusable," after assessing the array of statutory and regulatory consequences she would face as a result of her conviction (such as loss of teaching eligibility and eligibility for grants, loans, and work assistance), he sentenced her to a non-incarceratory sentence of probation.  Judge Block recognized that notwithstanding Ms. Nesbeth's underlying misconduct and high advisory guideline range, under the circumstances, the collateral consequences she would face as a convicted felon were enough.

As in *Nesbeth*, even *putting aside* the stigma and humiliation attached to his status as a "convicted felon," Eric faces many additional serious and potentially-permanent consequences as a result of his misconduct federal felony conviction.  Given Eric's dreams and aspirations of obtaining an advanced degree in neuroscience and then teaching, the severe collateral consequences he has faced and will continue to face may well exceed those faced by Ms. Nesbeth.  Accordingly, as in *Nesbeth,* this Court should consider these collateral consequences in determining Eric's sentence.

*Fourth,* Eric made substantial efforts to cooperate with the Government, including identifying his supplier. Although the Government has not filed a 5K1.1 motion, Eric's cooperation and assistance should be considered in fashioning his sentence. *See, e.g., United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) (in assessing a defendant's history and characteristics under 18 U.S.C. § 3553(a)(1), court should consider the defendant's "efforts to cooperate ["non § 5K1.1 cooperation"] even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1").

*Fifth,* Eric has no criminal history and at the time of the offense he was just 22 years old. As the record demonstrates, his behavior, the product of a disease, was aberrational, and his youth is a factor that may be considered in fashioning a just, and "individualized" sentence.

*Sixth,* despite Eric's remarkable progress, Eric's mental state remains precarious and without continued treatment there is a risk of regression, or self-harm. As Dr. Miller writes:

> Mr. Lonergan's greatest immediate worry, by far, is that a federal felony conviction will prevent him from being

accepted into a graduate program in neuroscience, dashing his hopes of doing further research to develop more effective and safer psychopharmacologic agents. In my view, this worry is so intense that it has caused him to suffer as much as, or even more than would be caused by incarceration. In effect, I believe it is fair to say that the impact of his arrest, indictment, public and private humiliation, and the dashing of his dreams has, in effect, been a form of incarceration. And I note that despite his transformation, there is still a fragility. Even now, there are times he feels so hopeless that he contemplates suicide; I would expect that such feelings would only increase with any sentence that included months in jail, as opposed to another form of punishment or detention. This, of course would be tragic and an enormous waste.

In sum, even before sentencing, Eric has suffered and been heavily punished for his conduct. At just 22 years old, Eric was on his way to a neuroscience degree from Wesleyan University, graduate school, and a brilliant career in neuroscience -- a career that his professors, physician, and others believe could literally have led to breakthroughs in the inner-workings of the mind and a potential cure for certain forms of mental illness. This is not hyperbole. (*See* Ex's 1-7.)

Tragically, as a result of his criminal conduct, those dreams have been dashed. Instead, Eric is now a convicted felon, whose name has been tarnished and whose picture and story will forever be

embedded on the internet.  This stigma is especially punitive for a young man like Eric.

The Government, by virtue of the arrest, indictment, conviction, and publicity (which now includes social media) has made its impact.  This impact has already served as a powerful general deterrent.  What college kid wants to risk arrest and indictment?  What college kid wants to be a convicted felon?

If a prosecution is ever capable of affecting future behavior (which is questionable), the mission has been accomplished.  In this case, on these facts, prison would be unduly punitive and it would actually undermine rather than serve the core principles of sentencing.  For all of these reasons and those discussed in the accompanying psychiatric and medical reports and 40-plus letters, we respectfully submit that, as in *Nesbeth,* a non-incarcerative sentence, which includes substantial community service, is warranted.

II.  FACTORS TO BE CONSIDERED IN IMPOSING AN "INDIVIDUALIZED" SENTENCE UNDER 18 U.S.C. § 3553(A)

As the Supreme Court stated in *Gall v. United States*, 552 U.S. 38, 50 (2007), a district court "may not presume that the Guideline range is reasonable."  Instead, the Court must "make an

individualized assessment based on the facts presented." *Id.*

Furthermore, as is now well established, the Court in *Gall* rejected the

idea that "extraordinary circumstances" are required to justify a

sentence outside the Guidelines' advisory range. *Id. a*t 47. The Court

also rejected the use of rigid mathematical formulas to determine

whether a variance from the Guidelines' sentence range is justified.

*Id.* Accordingly, after calculating the proper offense level under the

Guidelines and giving the Government and Defendant the opportunity

to argue for the sentence they believe to be appropriate, the district

judge must consider each of the § 3553(a) factors and "tailor the

sentence" to fit the particular circumstances of the case. *United*

*States v. Booker,* 543 U.S. 220, 245 (2005).

Thus, as this Court is aware, the import of *Booker* is that

"sentencing judges have broad discretion to impose a non-guideline

sentence by weighing the factors under § 3553(a)." *United States v.*

*Robertson*, 662 F.3d 871, 875 (7th Cir. 2011); *see also* United States v.

Cavera, 550 F.3d 180 (2d Cir. 2008) ("A sentencing judge has very

wide latitude to decide the proper degree of punishment for an

individual offender and a particular crime"); *United States v. Crosby*,

**397 F.3d at 111-12 (applicable Guideline range was only one of seven factors that a sentencing court must consider achieving a "somewhat more individualized justice").   The § 3553(a) factors include:**

**(1) the nature of the offense and history and characteristics of the defendant;**

**(2) the purpose of sentencing;**

**(3) the kinds of sentences available;**

**(4) the Sentencing Guidelines;**

**(5) the policy statements issued by the Sentencing Commission;**

**(6) the need to avoid unwarranted disparities among similar offenders; and**

**(7) the need to provide restitution to any victims of the offense.**

**Application of the § 3553(a) factors to this case leads to the conclusion that a sentence of probation with a special condition of substantial community service as more fully described below (plus a fine, home detention, or some combination of these activities) is appropriate.  Indeed, this case exemplifies why the Supreme Court rejected mandatory and mechanical application of the Sentencing Guidelines and restored district courts' discretion "to consider every**

convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S.Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted).

The factors addressed below, both individually and in combination, take this case out of the heartland of similar guidelines range cases, warrant a variance, and illustrate why probation is a punishment "sufficient, but not greater than necessary, to accomplish the sentencing goals advanced." *Kimbrough*, 552 U.S. at 111.

## A. Nature of the Offense and History And Characteristics of the Defendant

As he will address directly with the Court at the Sentencing Hearing, Eric stands by his plea, acknowledges his guilt, and fully accepts responsibility for his conduct. Eric was a drug dealer at Wesleyan University, and nothing herein is intended to diminish these facts. It is important to note, however, that Eric and his co-conspirator Zachary Kramer plead guilty to the same crime: conspiracy to possess with intent to distribute MDMA, a controlled substance, in violation of 21 U.S.C. §§ 841and 846.

As the Indictment correctly alleges:

"In or about November 2013 defendant ERIC LONERGAN began purchasing and redistributing a mixture and substance containing a detectable amount of MDMA, which is also known as, and will be referred to herein, as, "Molly." (Indictment, Par. 2.)

"In or about December 2014, KRAMER took over for LONERGAN as the primary supplier of Molly at Wesleyan. KRAMER charged similar prices as LONERGAN, but also sold Molly in bulk quantities." (*Id.*, at 11.)

"In January 2015, KRAMER returned to the Wesleyan campus with at least 25 grams of Molly. He provided the Molly to some of his friends for redistribution to other students on campus." (*Id.*, at 12.)

"On February 21, 2015, eleven individuals, including ten Wesleyan student, overdosed on a substance they believed was Molly, and many were transported to the hospital. These students reported similar symptoms as the students who overdosed in September 2014. Two of the students were in critical condition, and one of those students had to be revived after his hear stopped. All of these students obtained the purported Molly through individual distributors who were supplied directly by KRAMER." (*Id.* at 13.)

Although Eric's conduct is inexcusable, as discussed below, it is explicable.

1. Eric's Childhood

Eric's father Peter obtained a BA in Mathematics from Princeton and a Masters in Electrical Engineering from Columbia University; his mother Maria Cecilia Pinto de Moura holds Electrical Engineering

degrees from Princeton and Columbia.  Eric was raised in a middle class family in Brazil, where Cecilia was raised, and where Peter found work as an engineer for a telecommunications company.

Despite his loving and highly-educated family, Eric faced challenges as a child.  Like their own parents, Eric's parents encouraged him to pursue intellectual projects.  Although his parents were supportive, Eric's school life was challenging.  He was introverted, intellectual, and unathletic.  While in grade school, he was heavily bullied.  By 5th Grade, he started developing physical symptoms from his constant psychological distress, manifesting as bouts of low blood pressure and dizziness.  His parents moved him to another school, but things got worse and he was continually taunted by his classmates.  The bullying escalated to a physical level, and he endured several beatings from his classmates, causing him to live in dread and fear.

Once again, he switched schools, this time to a highly-rigorous preparatory high school.  There, he found solace by hiding in the library, focusing deeply on his studies.  Around that time, his father Peter began to reveal his own crippling depression, which created

stress on the entire family.  This created in Eric a burning desire to help his father, as well as his girlfriend, who was actually suicidal (*See* Ex. 18, *infra*), and he channeled this desire into neuroscience.

      2.     **Eric's Departure from his Home and Family**
              **In Brazil, Travel to Wesleyan, and Descent**
              <u>**into Severe Depression and Illness**</u>

In 2011, Eric flew from Brazil to Wesleyan, leaving his girlfriend, family, and friends behind.  The culture shock for him was intense.  During his freshman year, his long-distance girlfriend became critically ill.  She descended into anorexia, bulimia, and suicidiality. (Ex. 18.)  She had no support from her family, so Eric bore the burden of remotely preventing her from killing herself, literally spending hours every day Skyping with her, trying to convince her to eat.  Unfortunately, without professional help, she further spiraled, as did their co-dependent relationship.  By the end of Eric's sophomore year, this relationship, his only source of emotional support, had completely collapsed and he was in turmoil.  Wesleyan's psychological health services were unequipped to deal with the distress of hundreds if not thousands of students, appointments were nearly impossible to arrange, and drugs were ubiquitous.

In November 2013, Eric's situation reached a breaking point. His best friend and roommate Jacob Cook succumbed to depression and suddenly dropped out. (Ex. 16.) Weakened by grief and academic pressure, he fell sick with a bacterial infection. He was prescribed a large dose of antibiotics by a Wesleyan physician, which caused a severe adverse reaction, manifesting as terrible panic attacks. (*See* Ex. 1, discussing contraindication of antibiotics with Bipolar Disorder.) He was crippled by despair. From his *delusional viewpoint* at the time, there was no way out except through the supposedly "therapeutic" properties of psychoactives such as "Molly." Several studies he had read noted that MDMA was used to treat post-traumatic stress disorder. (See *infra,* at 29, n.9.)

In a manic frenzy, now diagnosed as a true prolonged manic episode associated with my Bipolar Disorder (Ex. 1), Eric acquired via the internet and then distributed an unscheduled analog of MDMA called MAPB. It seemed to lift away his traumatic emotions. His peers told him he was helping them not only escape their sorrows, but resolves them. Since this is precisely what he had always aimed for, he believed them, and his delusional and maniacal mental state

convinced him he was actually helping people, when in reality he now understands he was potentially putting them, as well as himself, in danger.

As he will address directly with the Court, Eric was young and foolish, and depressed as he was, he was also arrogant. He is deeply ashamed, and with the benefit of hindsight, shocked by his reckless, illegal, and dangerous misconduct. As he will further directly address with the Court, and as many others have uniformly attested, he never would have intentionally sought to harm anyone. To the contrary, misguided and deluded as he was, he actually thought he was "helping." He was, of course, wrong and will always suffer from a profound sense of remorse, while forever thankful that no one was permanently harmed.

3. **Dr. David Miller's Diagnosis of Bipolar Disorder (A Disease That Also Inflicted Eric's Father and Grandfather) Which, Coupled With Eric's Fascination For and Interest In Neuroscience, Led to Eric's <u>Severe Manic State and His Underlying Misconduct</u>**

For the past 15 months, Eric has been treated by Dr. David Miller, who has diagnosed Eric with Bipolar I Disorder. Dr. Miller received his undergraduate degree, Magna Cum Laude, from Harvard

College and his M.D. from the Columbia University College of Physicians and Surgeons.  He has been Certified by both the American Board of Psychiatry and Neurology and the Board on Professional Standards of the American Psychoanalytic Association and he serves as a Clinical Professor of Psychiatry at the George Washington University Medical School, Department of Psychiatry and Behavioral Sciences.[7]

Dr. Miller is not a paid "expert."  He is a treating physician, and his Report provides a cogent explanation, backed by medical analysis and records, regarding the essential role Eric's Bipolar Disorder played in Eric's his actions in distributing drugs on campus.

It should be noted at the outset that Dr. Miller's diagnosis and conclusions are supported by, among other things, the fact that Bipolar Disorder is hereditary and, sadly, Eric's father and his (now deceased) paternal grandfather suffered from the same disease.[8]

---

[7] *See* Exhibit 1 (Report and C.V.)

[8] Eric's father Peter and his paternal grandfather's wife Elaine Cooper (a Clinical Professor of Psychiatry at the University of California School of Medicine who was married to Peter's father Ted) write movingly -- and tragically -- of the Lonergan family's history of Bipolar Disorder.  *See* Ex. 1, at 2; Ex's 28 and 29.

Initially, Dr. Miller writes,

At the time of our initial consultation, Mr. Lonergan was profoundly and clinically depressed, plagued by suicidal thoughts, and also by periods of intense anxiety, verging on extreme panic.  As discussed below, however, he recognizes and fully accepts the severity of his wrongdoing at Wesleyan University and he has made extraordinary, even transformative, progress through extensive therapy, drug treatment, employment, and community service.

In my view, Mr. Lonergan's distorted thinking about his own drug use and later, about the appropriateness of selling drugs to his classmates, indicates a frank, long-lasting manic state; without medical intervention, such states can last for many months before a "crash" and subsequent severe depression. His clinical picture is consistent with a first episode of Bipolar I Disorder (APA DSM 296.6x).  Supporting this diagnosis is that his manic state was preceded by a prolonged period of severe depression.  This diagnosis is also supported by the fact that during the manic phase, he experienced grandiosity, euphoria, and a denial of obvious wrong-doing and risk.  In short, and as further discussed below, his wrongful conduct was indeed due to a severe mental disorder, which blocked his awareness of its illegal and dangerous aspects.

To substantiate my conclusion that Mr. Lonergan was suffering from a manic episode at the time of his illegal activity, I will list some of the features enumerated in the American Psychiatric Association, Diagnostic and Statistical Manual, (DSM V, pp. 124) as characteristic of a Manic Episode: 'inflated self-esteem or grandiosity,' 'more talkative than usual,' 'subjective experience that thoughts are racing,' 'distractibility,' 'increase in goal-directed activity (either social, at work or school, or sexually),'

'excessive involvement in pleasurable activities that have a high potential for painful consequences.' Mr. Lonergan displayed all of these signs of mania. An additional criterion that Mr. Lonergan met, clearly and tragically, is that 'the mood disturbance is sufficiently severe to cause marked impairment in social or occupational functioning.'

Further and compelling evidence to support the diagnosis of Bipolar Disorder is that both Mr. Lonergan's father and his paternal grandfather have received this diagnosis. It is well established that the etiology of Bipolar Disorder has a very strong hereditary component. In the chapter on Manic-Depressive Psychosis (an alternate name for Bipolar Disorder), a classic textbook of psychiatry states: 'Hereditary predisposition is the most important predisposing aetiological factor. Kraepelin and numerous others have stated that 60-80% are hereditarily predisposed. When this type of disorder exists in the parents, the same type is likely to show itself directly among the descendents.' (Sir David Henderson and Ivor R. C. Batchelor, Textbook of Psychiatry, London: Oxford University Press, 1962.)

Mr. Lonergan recalls his state of mind during his period of wrongful behavior at Wesleyan as precisely that described in the DSM as manic: he felt intense pleasure, at times euphoria, and had no awareness of the danger he posed to himself and to others, demonstrating the DSM criterion: 'excessive involvement with pleasurable activities that have a high potential for painful consequences.' He had trouble sleeping, lost weight, and became hyper-talkative. Consistent with the DSM diagnosis of Bipolar Disorder, his mood disturbance caused 'marked impairment' in his functioning. . . his judgment showed such 'marked impairment' that he felt no concern. He demonstrated 'grandiosity,' reveling in how well-known he had become on campus. And throughout this period he felt free of worry. No one in his right mind could have been illegally

sharing drugs in a small college community without worrying about being found out and punished. He was not in his right mind. **(Ex. 1.)**

Dr. Miller further observes that Eric's severe, long-lasting manic episode correlated to other "multiple simultaneous factors, which seemed to trigger him in a manic state, consistent with Bipolar 1":

[H]e felt hopelessly behind in his academic work; perhaps due to the related stress he developed severe abdominal discomfort; the Wesleyan Student Health Service diagnosed a "stomach bug" and prescribed antibiotics, clarithromycin and amoxicillin, to take orally. Soon after, he felt panicky and developed the delusion that his stomach ailment was due to inflamed kidneys, as documented in the Wesleyan Student Health Service notes I have reviewed. The physician also describes him as having rapid speech and insomnia, key features of mania. This sequence recalls a recent report in Neuroscience News (July, 2016) in which a study of over two hundred subjects at Johns Hopkins Medical Center suggests that for patients with an underlying mental disorder antibiotics may trigger manic episodes. Finally, during this period, Wesleyan students celebrated what they call "Duke Day," on which many of them take all the hallucinogens they can obtain. Mr. Lonergan was deluged with calls from students seeking his drugs and he felt "obligated" to provide them "because of their need," though as he came to see in retrospect, it was actually because of his manic grandiosity: he felt that after years of anonymity on campus, he was now "famous." (*Id.*)

Additionally, Dr. Miller reports that,

[T]here is little doubt that the breakdown in Mr. Lonergan's thinking, his final decompensation, was the end result of many years of depression, misery, and stress. Even in middle school, in Sao Paolo, Brazil, he had been bullied severely, and when his parents switched him to another high school, the cruel bullying continued, and even worsened. The bullying included beatings. With the move to the U.S. for college, he hoped he would be able to make friends and begin to feel good about himself, but by then he was so introverted and socially awkward, partly because of the change from Brazilian to American cultural norms, that he was even more isolated, except for a long distance relationship with a girlfriend in Brazil. She was deeply depressed and even suicidal, and he lifted his mood by trying to help her. When she finally felt better, she threw him over for another young man, plunging Mr. Lonergan into a deep depression; he felt isolated, despondent, at times suicidal. This is when he began experimenting with drugs, not to get "high," but to get out of his state of despair, essentially, in his view, to save his life. (*Id.*)

Fortunately, as noted above and discussed in greater detail in

Dr. Miller's Report, while still fragile, Eric has undergone a

transformation:

His employment and community service efforts have shown Mr. Lonergan for the first time in his life that he can gain recognition and self esteem by applying his deep interest in psychoneuropharmacology, an interest that long precedes his college years. His aim since high school had been to get a Ph.D. in neuroscience and to help develop more effective, targeted treatments for behavioral disorders. <u>But for his felony conviction, this goal would not be unrealistic: Mr. Lonergan clearly is a brilliant young</u>

man, well read in many areas of study, and remarkably knowledgeable about psychoneuropharmacology.

In addition to his brilliance, it is noteworthy that Mr. Lonergan has a strong desire to contribute to the welfare of his fellow human beings. The specific form of his breakdown at Wesleyan, as is typical with manic episodes, reflected his underlying character, including his scientific brilliance and his altruism (I do not believe it is a coincidence that the underlying drug was an analogue to "MDMA" [9] as opposed to, for example, crack cocaine), though his manic disorder grossly distorted his judgment.

---

[9] Since his manic episodes have been diagnosed and he is in treatment, Eric understands just how dangerous it was -- for himself and, even more importantly, for others -- to experiment with a potentially-adulterated drug like "Molly."  Nevertheless, while inexecusable, it is understandable how Eric's mania fooled him into believing he was participating in a breakthrough in treatment science, precisely because such a breakthrough is actually arguable occurring.

MDMA (first synthesized over a century ago) was used clinically by psychiatrists before it became popular as a recreational drug; it was not until 1985 that MDMA's growing recreational use led the Drug Enforcement Agency ("DEA") to ban it and add it to Schedule I (containing substances with no therapeutic value) .  *See* A Brief History of MDMA, National Institute on Drug Abuse (March 2006), https://www.drugabuse.gov/publications/research-reports/mdma-ecstasy-abuse/brief-history-mdma; Ben Sessa and David Nutt, Making a Medicine out of MDMA, the British Journal of Psychiatry 206(1) at 4-6 (2015).

However, a growing body of research reveals that MDMA may have legitimate, potentially-groundbreaking clinical applications in the treatment of PTSD and depression.  *See, e.g.,* Sessa and Nutt, Making a Medicine, *supra* (noting, for instance, that "[a] recent placebo-controlled study of participants with treatment-resistant PTSD

. . . . Making a contribution to society is so important to Mr. Lonergan that I feel confident he will go on applying his talents toward the welfare of others.  (*Id.*)

. . . A factor that is helping his mood is my prescription of Parnate, 10 mg. three times a day; this anti-depressant is an MAO inhibitor that was denied him at Wesleyan, although he had learned from previous treatment that it works for him.  Though he now feels a profound sense of contrition and remorse about his drug-related behavior at Wesleyan and recognizes fully that he was delusional at

showed that *85% of those in the MDMA group (compared with 15% in the placebo group) no longer had a diagnosis of PTSD after three sessions of MDMA-assisted psychotherapy*" and that, remarkably, *"[t]hese results were sustained at 3.5 years long-term follow-up, with no further MDMA interventions required and many patients reducing or stopping their regular psychiatric medications"*) (emphasis added); *see also* Michael Pollan, <u>The Trip Treatment: Research into Psychedelics, Shut Down for Decades, Is Now Yielding Exciting Results</u>, The New Yorker, Feb. 9, 2015.  Since the DEA's decision in 2015 to approve U.S. clinical trials, the early results of those domestic trials have been very promising.  *See* Elizabeth Hernandez, <u>Boulder Study Uses MDMA, therapy to treat PTSD Sufferers</u>, Denver Post, September 19, 2015, http://www.denverpost.com/2015/09/19/boulder-study-uses-mdma-therapy-to-treat-ptsd-sufferers/ (reporting that, in an ongoing Colorado clinical trial, "none of the more than 1,000 people involved . . . have had any adverse events").

None of this excuses Eric's conduct, but it helps to frame it.  Eric was a student of neuroscience, motivated by a desire to help people with depression (and intimately familiar with depression himself), and aware of the potential psychiatric benefits of *unadulterated* MDMA.  One can see how, in a person with that knowledge and background, Eric's undiagnosed bipolar disorder -- a condition characterized by inflated self-esteem, grandiosity, and poor impulse control -- resulted in the worst decision of Eric's life.

the time, Mr. Lonergan knows that his work in therapy is not completed; he is committed to further therapy to help him better manage the underlying issues that led to his psychiatric decompensation at college. In the immediate future, he would like to continue with the tutoring and other community service, which he finds deeply meaningful, while figuring out how to resume his education and move toward a career in public service or medical science, if that is possible.

<u>I sincerely believe that Mr. Lonergan has the capacity to make a major contribution to the field of psychoneuropharmacology, one that will enhance the well-being of countless people who suffer from mental illness</u>.

For all of these reasons, a departure under Section 5K2.13 or variance are warranted.

4.    **The Offense Conduct Was Aberrant, In Stark Contrast to Eric's Extraordinary Intelligence and Exemplary Character**

While not unusual for a defendant awaiting sentencing to solicit supportive letters, in Eric's case, many of the letters were unsolicited. The quantity *and* content of the letters is powerful and, indeed, moving. Whether from esteemed Wesleyan University professors; friends, peers, or classmates; a business partner and mentor; or those helping to sponsor Eric's community service efforts, the glowing letters reflect Eric's exemplary character, decency, integrity, and extraordinary commitment to helping others and society at large.

### a. Eric's Wesleyan University Professors

Five Wesleyan Professors have offered profligate praise of Eric's intellect and character. Notably, each was written after Eric's arrest, expulsion, and federal indictment.

Professor John Rouse, Hedding Professor of Moral Science in the Department of Philosophy and the Science in Society Program, who has taught at Wesleyan for 35 years, observed that he had "ample opportunity to get to know Eric's intellectual interests, ability, and the ways in which he engaged others in philosophical conversation." Following are just a few relevant excerpts from Professor Rouse's remarkable letter:

- Eric is among a small handful of the most philosophically and scientifically talented students I have taught in my career. He stands out even among that extraordinary group for his passion to understand the mind, and his dedication to learning.

- Students with Eric's intelligence, articulateness, and energy can easily have a negative impact on a course, by discouraging other students from participating in discussion because they recognize that they cannot contribute at a similar level. That did not happen with Eric, and the reasons it did not were instructive. The most important reason that Eric's energetic participation was so constructive . . . was the way in which he engaged with others in the class. When other students expressed

uncertainty or confusion, or when they brought up issues in ways that showed an underlying misunderstanding, Eric frequently offered responses that were genuinely constructive and encouraging. He could correct another student's mistake, or help clarify an issue he or she found confusing, with a kind of generosity of spirit and tone that made them feel that what they had said was important and helpful to the class. He was never dismissive or belittling . . . . Eric went out of his way to build upon what others had said, and to recognize important insights by others that could take our discussion and understanding further.

- Eric made another contribution of a different kind . . . which was more subtle. He brought extensive background in relevant sciences as well as in the philosophy of mind. He was able to recognize when scientific issues were relevant and important to what we were talking about, and to talk about that material clearly, without ever suggesting that once we knew the scientific background all of our philosophical concerns would be settled. . . .

- For students who were unfamiliar with, or even afraid of, some of the scientific background to our discussions, Eric helped make it accessible and unthreatening, while also encouraging everyone to take it with utmost seriousness.

- Eric has clearly made a serious mistake as a young man, and has now acknowledged and regretted that mistake. The events that brought him into your court stand out against the background of what has been central to his life: a sustained love of ideas, and of constructive intellectual engagement with others, in pursuit of a deeper understanding of our cognitive and affective humanity.
- I fervently hope that, once he has the opportunity, he will return to his scientific and philosophical pursuits. He has the ability and drive to go on to further study and make a

**significant impact as a scientist or scientifically informed philosopher, and as a teacher.**

- **He has extraordinary talent, and the kind of commitment to learning and to engaging intellectually with others that is needed to succeed in these highly cooperative fields of inquiry, and to guide and aid others effectively. (Ex. 2.)**

**Professor Matthew Kurtz, Associate Professor in Psychology**

**and Neuroscience and Associate (Adjunct) Professor of Psychiatry at**

**Yale School of Medicine, writes:**

- **His commitment to his work is evident in his grades, which were high even among an overachieving elite college student body (he received an A in my class).**

- **It is also important to note that Eric made clear his interest in pursuing a career in neuroscience during his sophomore year. This fact stuck in my mind, as it is very unusual for our students to express such a desire so early in their career and suggested to me, given his intellectual capacity, exacting work ethic, and abiding interest, that he would have a very bright career in the field of neuroscience.**

- **Eric was always respectful, thoughtful and highly appropriate in his interactions with me and expressed the careful attention to detail associated with high achieving students who are aiming to get the very best possible grade they can. In short, he struck me as student who had mapped out a career trajectory for himself at an early age and had the tools to get there. (Ex. 3.)**

**Professor John Kirn, Professor of Biology, Neuroscience and**

**Behavior and Chair of Biology, writes:**

- **Eric was a solid A student in my classes. He was very motivated and displayed great enthusiasm for the topics covered in a class on the neurobiology of learning and memory.**

- **He showed great originality in the ways he reinterpreted data from the published literature. We even considered submitting a revised version of his term paper for publication.**

- **His attention to detail was incredible. Before his presentation, he filled two very large chalk boards with equations, metabolic pathways and neural activity patterns, to supplement the powerpoint slides he presented.**

- **He was also a highly ethical student in my class. This was evident by the care he took to provide citations for all materials in his powerpoint slides that were gotten off the internet, as well as for ideas that were not his own in his term paper. In short, Eric excelled in academics and was a joy to have in my classes. (Ex. 4.)**

**Professor Steven Horst, full Professor of Philosophy (since**

**1990) and Ph.D. writes:**

- **I have known Eric Lonergan since the Spring of 2012, when he was a student in my Philosophy of Mind course, in which he was the only non-philosophy major to receive an A, and one of the rare freshmen ever to do so.**

- **Unlike most office-hours visits, which are related to assignments, grades, or topics from the class sessions, Eric would come to talk about subjects of mutual interest that he was interested in exploring further, such as the relationship between quantum mechanics and consciousness. He was clearly an avid**

reader of recent publications, both popular and professional, in philosophy and the cognitive sciences, and eager to explore them further.

- In my job, there are a small number of students one works with over the years that one quickly comes to think of more as junior scholars than as students. Eric is certainly one of these and . . . shows signs of brilliance . . . I came to expect that he would go on to pursue a career in academic research in the cognitive sciences, and that I would someday see him as a keynote speaker at academic conferences.

- In addition . . . Eric has always struck me as a genuinely nice person: kind, gentle, respectful and responsive to the ideas of other students. One of last year's graduates, one of our best students, described him as one of her closest friends at Wesleyan, and I strongly suspect that it was in part the fact that she had such a brilliant friend to share ideas with that helped her blossom . . . Eric is the kind of person who inspires and challenges those around him, including his teachers, to think deeper and more broadly. (Ex. 5.)

Finally, Professor Aaron Gloster, Associate Professor of

Biology, Neuroscience and Behavior writes:

- I first met Eric in the fall of 2014, when he enrolled in "Mammalian Cortical Circuits" (BIOL347). This is the most advanced course I teach and is taught at the graduate-school level.

- I rarely offer unsolicited advice to students, but I remember telling Eric that I thought he was an excellent candidate for neuroscience graduate school and that he should seriously consider pursuing that career path.

- **Eric has potential as a great scholar. . . . I still believe strongly enough in Eric's potential that, should it become a possibility for him, I would be happy to provide any advice or guidance that he might request as he pursues a career that would both support himself and provide benefits for the greater community.  (Ex. 6.)**

### b. Eric's Friends, Peers, and Wesleyan Classmates

Eric's peers offer similar praise regarding his care, compassion, and the positive and enduring impact he has had on their lives.  The following are simply illustrative.  Jack Singer graduated from Wesleyan in 2015, with High Honors in Earth and Environmental Sciences and a second Major in biology.  After graduating, he entered public service and currently works on an Indian Reservation in California (Redwood Valley Rancheria of the Little River Band of Pomo Indians).  Jack writes that he had and Eric formed a relationship at Wesleyan "that has profoundly changed my life."  He describes Eric as "a brilliant student who is regarded by his classmates as destined to change the world" and notes that "Eric devotes an enormous amount of his time helping others," stating that "his passion and clear vision for his life's work distinguished him even amongst a diverse and driven group of peers at Wesleyan University."

With regard to Eric's compassion for others, Jack writes:

Eric's ability to relate cutting edge neuroscience with scholarly philosophical thought from various millennia and hemisphere is overshadowed only by his seemingly endless compassion.

In 2013, one of [Eric's] hallmates became close friends with both of us while battling intense depression and anxiety. Eric was almost never apart from his friend . . . . Eric was never slow to praise John's dedication to his artwork and indirectly help him view and utilize his passion and talent as his outlet.  When John could not leave home, Eric was at his side, doing homework, talking, and simply keeping company in the dorms.  This remains deeply impressive to me; that such a well-rounded, busy, and driven individual like Eric could unquestionably devote so much time and energy to nurturing somebody else while clearly dealing with his own challenges all the while.  This anecdote speaks to the character of Eric that know is his true self.

With regard to Eric's extreme remorse, Jack writes:

In the hours ensuing the tragedy that unfolded at Wesleyan in February of 2015, I spoke with Eric one-on-one and was overwhelmed by the grief he felt on behalf of our classmates . . . The hospitalization and critical condition of one sophomore devastated him more than anything I have yet witnessed . . .

Finally, with regard to Eric's potential, he writes:

I have listened quietly more times than I can count while Eric helped peer students to improve themselves.  Whether he is . . . simply helping fellow students to work through complex concepts and important facts, he is a true overachiever when it comes to helping others. . . . there is never a moment when he is not there for me as a friend.  I

know that our world will be a better place so long as Eric Lonergan is here to contribute to the well-being of our society and the advancement of medicinal neuroscience. (Ex. 12.)

Zack Cohen, a 2015 Wesleyan graduate with degrees in

computer science and music similarly writes about Eric's intelligence,

gentleness, kindness, and compassion:

I have known Eric for almost five years now. We met my first week of college and have been friends ever since. Eric was always a mentor and source of knowledge for my friends and I – a genuine human who always gave his truthful and honest opinions towards any topic of conversation. It was not long until one noticed the intelligence and passion present in such an individual.

I always considered Eric one of my most academic and studious friends. The amount of time he spent focusing on his work was indicative of someone who truly believes that within his area of study (neuroscience) he could make a real difference in the world. I have never seen someone so dedicated and hard working . . . I would often ask to hang out only to be declined because Eric was busy studying for numerous tests and working on homework and papers.

. . . Eric's passion for his work is reflective of his desire to take part in this scientific exploration of the human brain where the future is full of cures and therapies for those many people suffering from these disorders. As someone whose parents both have neurological conditions (MS and Parkinson's) it would be a shame to see such a bright individual not be able to take part in the field responsible for finding cures for these horrible diseases.

Never have I or any of my friends spoken badly about Eric. We have always considered him to be a gentle and kind individual who would never wish harm towards anyone. He was thoroughly missed during our last semester at college. Eric is someone who wants to help the community and help the world become a better place. His amazing intellect and passion could do wonders for the world in which we live. (Ex. 13.)

Delilah Seligman, a 2016 Wesleyan graduate writes of how Eric

helped her with her own trauma, through his warmth and sensitivity,

and had an enduring impact on her life:

When I met Eric, I was struggling with a plethora of life challenges, including a dysfunctional family on the edge of collapse, a growing list of mental health concerns, and the beginning years of my gender transition into my authentic self. It is no overstatement when I say that I would not have made it through that time period without the support of Eric. . . . I found that beneath Eric's composed and stoic presentation is one of the warmest, most genuine souls I have had the pleasure of knowing . . . it was clear that Eric and I had many experiences in common, many of them traumatic, unfortunately.

. . . As a neuroscience and philosophy double major, Eric has a mind that could rival some of the greatest minds of our time. I have no doubt that Eric has the capability of inventing something great for the world. Secondly, Eric is, at heart, a teacher and a guide. He clearly has a great passion for learning and for sharing what he learns with others, and he has a gift . . . as he has helped me overcome the challenges that I have faced in my life. Third, the story I shared not only demonstrates Eric's intellectual and spiritual prowess, but it also reflects his capacity for change. . . . Finally, I believe Eric simply has a lot of love,

patience, and grace in his heart. I am so grateful to not only have a mentor and guide through these challenges, but also a loving friend  who means a great deal to me.  (Ex. 14.)

Another Wesleyan graduate, Dorothy Mae Ajayi, who was born in Nigeria and faced some of the same challenges as Eric, conveys similar themes concerning Eric's friendship and assistance to her:

In our college experience, it was rare to find someone who loved their studies so passionately and dedicated themselves to it.  It was rare to find someone who worked for what they loved instead of pushing through life and academic careers for the sole purpose of social recognition and/or financial prosperity.  From my experience, this was certainly the mindset at Wesleyan. . . . I always knew that when in doubt I could reach out to my dear friend . . . I was in an abusive relationship with two men at Wesleyan once, and talking to Eric and his general presence in my life helped me break away from those habits, strengthen my relationship with myself and make changes for a better future.  These discoveries were born from simple, loving and earnest conversation.  . . It is a rare occasion to have a real friend like this in Wesleyan's social environment when most of the others around are hyper-concerned with themselves, their image and strange conceptions of "cool."

This is who Eric is, a caring and selfless individual who transcends the conventional nature of a friend, because he truly is so much more. He's a dreamer, a philosopher, a researcher and an inventor – he's someone that wants to help change the world for better. . . . I know that last year's events have been hard on Eric, his family as well as members of the Wesleyan community. I also am aware that Eric has been lifting himself up and getting closer to his

dreams despite the certain circumstances he now faces for his actions. It inspires me that he continues to keep himself busy while trying to better the lives of others . . . (Ex. 15.)

Eric's former roommate Jacob Cook, a recent Wesleyan graduate, movingly relates that Eric helped, in effect, save him from several of his own serious problems:

Like me, Eric was an outsider, an intellectual, a voracious reader, a romantic, a philosopher, intensely serious at some times and playful and funny at others. It was the fastest friendship I've ever formed.

Unfortunately, it soon became clear that I would have to take a medical leave from Wesleyan. I was severely depressed and needed to pursue treatment. Having always been an overachiever, I was terribly disappointed in myself and felt like I was a failure at life. The only bright spot in that difficult time was Eric. Eric hadn't known me for more than a week or two, but I remember him being terribly disappointed to see me go. He assured me that he would stay in touch, that he would see me when I returned, and – most astonishingly – that when I got back in September, he would introduce me to some like-minded friends so that I wouldn't have to worry about being alone again. I found this deeply comforting.

Knowing that Eric would be there for me, I found the strength to get back on my feet and keep improving over the course of the next 8 months. Sure enough, when I returned to Wesleyan next fall, Eric was my anchor.

We were roommates for a brief time during the next fall semester, but I had become depressed again and I decided

I had to take another medical leave of absence in October. He was devastated to see me leave, not just because he would miss one of his dearest friends, but because he hated to see me in pain.  This is a consistent pattern I've noticed with Eric: no matter what problems he faces in his personal life, he is always keenly sensitive to the suffering of others.  More than once, he came home upset and distressed by the personal issues of people he had apparently just met a few days ago.  He had boundless empathy for the people who opened up to him, many of them loners like me . . . .

Eric is one of the kindest and hardest-working people I've ever had the good fortune to meet, and I've always wished that I could be more like him.  Without Eric by my side, I wouldn't have made nearly as many friends at school, I wouldn't have had a source of support during the hardest times, and I might not even be attending Wesleyan anymore. He is a source of inspiration to me, and I could not rate his character any more highly.  (Ex. 16.)

The letters from Eric's friends and Wesleyan classmates go on, and it is impractical to quote from all of them, but for present purposes, two more are illustrative.  First, Gabriel Elkind, a recent Wesleyan graduate and presently a Ph.D. student in engineering, tellingly summarizes the same wonderful qualities discussed by so many others.  Although Gabriel's letter is quite long, a few passages stand out:

Another long-scale quality which gives me incredible hope for Eric's future is his dynamicism in the face of adversity. Eric is the sort of man who is humble enough to change

when he is shown that his behavior is harmful or ineffective.  See, that's the irony which makes all of this situation so tragic in my eyes.  I know that anyone who understands Eric's state and potential like I do would have love, admiration and mercy for him, but that those who judge him today will know only a fragment of his person.  Because the last time I spoke to Eric before all of this happened, I seriously urged him to halt what he was doing.  He had soaked my shoulder in tears and told me about the behavior in his life he was putting an end to, the mistakes he'd made plans to absolve, and the positive changes he was making to his lifestyle and mental health.  I had an incredible amount of hope at that moment that the poor choices for which Eric is to be judged for today would end peacefully -- that they would remain an incredibly misguided, yet insignificant blip within the context of a long career and an adulthood laden with passion, achievement and wise decisions.

It worries me that Eric's future will be forever marred by his missteps because in my mind they don't begin to define who he is.  It isn't that I don't believe in Eric's ability to recover and thrive no matter what obstacles he faces -- I do.  It's just that I truly believe that the world needs Eric.  In my mind, he is an Einstein in his rarity -- a human being so gifted and benevolent, that I fear history will look back on the story of Eric's life, wondering and wanting for what could've been accomplished with another year of his work on important developments in medicine and philosophy.

The man who stands before you is so much more than the mistakes he has made. It is rare that the human race is blessed with persons who possess such a calibre of brilliance, ambition, and good will simultaneously.  I am deeply disturbed at the prospect of his imprisonment and I pray that the justice which faces him will be compassionate, and that he will be given the opportunity to redeem himself and reach his destiny.  I pray, too, that he

will be seen in part as I see him, for his potential and his trajectory, and not, as I fear, for his momentary fall from grace.  (Ex. 17.)

Finally, Eric's former girlfriend from Brazil, Louise Bauer Gau, suffered from many ailments, including suicidiality.  While he was away at Wesleyan, Eric spent hours a day on "Skype" with her, and as she attests, Eric ultimately saved her life:

I can say that he's the most incredibly amazing person I have ever met. I had never met someone with his level of intelligence.  That isn't his only attribute, for he is also the person with the greatest heart I have ever met.  Ever since 2010, I have been the person with whom he maintained closest, constant contact.  He always told me that his dream was to improve the world through neuroscience.  He always made an effort to get better grades, not because he wanted to be better than others, but because of his genuine passion for his desired profession, which is his dream. His major does not exist in Brazil, and that's why he made an effort to obtain his place in an American university for the major he always wanted.

Throughout all this time I never noticed any character flaws or lack of concern for others.  On the contrary, he revealed true concern for the well being of all, to the point of dedicating his life to improve collective and individual lives through the discovery of new neuroscience-based therapeutic methods.

He was the only person who helped me when I went through depression and anorexia – without him, I would not be writing this letter now.  He was the essential factor in curing my depression and anorexia, being far more

significant than any psychiatrist of psychologist I have encountered.  I can say that without his help, I doubt I would have overcome these diseases. Without him, I wouldn't be here now.

From what I know of him, he would never harm anyone intentionally.  Considering all that has been said, I believe he deserves a new chance to prove his potential in helping to positively transform the lives of thousands, since his attitudes always carried good intentions, and he certainly has the necessary qualities to make his dream come true. Taking this away means to kill the dreams of a young and brilliant mind, subtracting from thousands who suffer from psychological disorders the chance of improving their lives and the lives of all those with whom they coexist.  (Ex. 18.)

### c. Eric's Mentor and Physician

The extraordinary testimonials are not limited to Eric's former classmates and friends.  They extend to people like Majed Tomeh, the public-service oriented Washington, D.C.-based businessman and entrepeneur, who is serving as a mentor to Eric.  Mr. Tomeh, who holds degrees from Princeton, Stanford, and Harvard, is working with Eric to create a healthy alternative to coffee and other such products. Mr. Tomeh's letter is quoted from elsewhere in this Memorandum, but with regard to Eric's attributes and characteristics, he observes:

It's clear that Eric is in his element as the scientist and inventor.  He has worked tirelessly developing the product – we are now on the 54th version, with some versions having multiple variants.  To my view, he evokes Thomas

Edison, albeit in a later era working tirelessly on a newer set of challenges.

On his own initiative, Eric has scoured scientific and medical databases, compiling his own database of the neuro-pharmacological properties of hundreds of plants and extracts, based upon the primary research of other scientists, research which he clearly yearns to conduct himself one day. He is a young man with a mission.

His core motivation is to help people struggling with depression, leveraging leading-edge knowledge of plant extracts and neuroscience.

 It is difficult to know the exact mix of genetics and life events that leads a young person to define their mission in life. No doubt, Eric did witness the emotional struggles of friends and relatives and he did engage with them emotionally throughout their struggles. This is where one can witness Eric's enormous capacities for empathy and personal warmth; and his drive to save others. (Ex. 11.)

Finally, as noted above, Dr. David Miller, who has come to know Eric well over the past 15 months, states that "the specific form of [Eric's] breakdown at Wesleyan, as is typical with manic episodes, reflected his underlying character, including his scientific brilliance and his altruism . . . though his manic disorder grossly distorted his judgment." (Ex. 1.)

These extraordinary letters present poignant themes of drive, decency, integrity, passion, compassion, kindness, and gentleness.

They present examples of selfless acts in service of others, which literally helped save at least one life (Louise Bauer Gau).  They also underscore Eric's extraordinary potential, and his acceptance, remorse, growth,  and rehabilitation.  Combined with the additional testimonials below regarding Eric's community service activities (in addition to the other section 3553(a) factors), we respectfully submit that they strongly support a non-incarcerative sentence.

     5.    <u>Eric's Cooperation With The Government</u>

As the Court is aware, under 18 U.S.C. § 3553(a)(1), the Court must account for a defendant's history and characteristics when fashioning an appropriate sentence.  A defendant's cooperation (or "efforts to cooperate") with the Government may be considered as part of that analysis, even in the absence of a formal § 5K1.1 downward departure motion.  *See, e.g., United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) (under § 3553(a)(1), a court should consider "the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1"), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007).  Further,

not only have sentencing courts considered non-5K cooperation, they have, in fact, granted downward departures as a result of such cooperation. *See United States v. Guzman*, 287 F. App'x 956, 958 (2d Cir. 2008) (Court properly considered defendant's "non-5K cooperation" pursuant to § 3553(a) and awarded a substantial downward departure); *accord United States v. Arceo*, 535 F.3d 679, 688 (7th Cir. 2008) (14-month sentence reduction for defendant's non-5K cooperation under § 3553(a)).

In this case, Eric provided information that was helpful to the federal, state, and local authorities. *First*, Eric timely proffered to the DEA and federal law enforcement complete and truthful information regarding the source of the drugs, the methods and means by which he obtained them, and the identity of the foreign laboratories that shipped them to him. This is particularly significant, given Special Assistant United States Attorney Eugene Calistro's (appropriate) acknowledgment that it was important to the Government to determine Eric's supplier.[10]

---

[10] Shawn R. Beals, <u>State Will Let Federal Court Handle Cases Against Two Former Wesleyan Students</u>, Hartford Courant, June 16, 2015 ("Calistro said federal authorities are still conducting their

**Second**, Eric provided corroborating information regarding his co-defendant and other individuals involved in the illegal drug transactions in this case. *See, e.g.*, *United States v. Garcia*, 926 F.2d 125, 128 (2d Cir. 1991) (affirming trial court's downward departure under § 5K2.0 despite absence of a Government motion under § 5K1.1).

**Third**, Eric identified to state and local law enforcement possible sources for narcotics on the Wesleyan campus. Again, this particular cooperative behavior is significant, as the holding in *United States v. Kaye*, 140 F.3d 86 (2nd Cir. 1998) makes clear that courts have the discretion to consider a downward departure under § 5K2.0, in the absence of a § 5K1.1 motion, where the defendant has cooperated with local law-enforcement authorities. *Id*. at 88-89.

**Finally**, Eric offered assistance to Wesleyan regarding any efforts to root out the distribution and use of illegal drugs on campus. Although, regrettably, Wesleyan declined the offer, as part of the lecturing and community service he has already performed, Eric

---

investigation into the original source of the drugs supplied by the two former students. 'We're always trying to look at the bigger picture to determine where the stuff came from.'")

remains ready to meet with campus officials, faculty, and students to assist in reducing the distribution and use of drugs on campus.

There can be no question that Eric made substantial efforts to cooperate with the DEA, state and local authorities, and Wesleyan University. And there can be no question that Eric remains willing to provide whatever assistance is necessary to identify sources, to change behavior among college students at Wesleyan and elsewhere, to prevent the use of hallucinogens, and to show by example how distributing illegal drugs can have a devastating effect upon the life and career of a college student. The level of cooperation and willingness to do whatever is asked is wholly reflective of a defendant who recognizes the wrong he has done and who, from the first meeting with the DEA, has committed to making sure at least some good can come out of this case. For these reasons, and as a matter of law, even in the absence of a § 5K1.1 motion, we respectfully submit that Eric's cooperation warrants a departure or variance.

6. <u>Eric Has No Criminal History</u>

As discussed herein and the PSR, Eric has no criminal history. Indeed, as the complete picture of his life reveals, even at his young

age, Eric is an exemplary young man, and his criminal behavior, the product of a "severe mental disorder" (Exhibit 1, at 1) was aberrational.

### 7. Eric's Youth and Family History

At the time of his arrest, Eric was just 22 years of age.  He was thousands of miles from home, lonely, with little to no support. In noting the mitigating qualities of youth the Supreme Court has noted that, "Of special pertinence here, we insisted in these rulings that a sentencer have the ability to consider the 'mitigating qualities of youth.' . . . . [Y]outh is more than a chronological fact.  It is a time of immaturity, irresponsibility, "impetuousness[,] and recklessness.  It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.'" *Miller v. Alabama*, 132 S. Ct. 2455, 2466 (2012) (internal citations omitted). Eric's youth and immaturity does not excuse his unlawful misconduct, period.  But his youth and immaturity further supports a non-incarcerative sentence, particularly when considered together with his Bipolar Disorder.

### 8. Eric's Extraordinary Growth and Rehabilitation

Eric's dream to be neuroscientist, to contribute to society, and to help others who suffer mental health problems was not a pipe dream. His professors, physician, and others have attested that Eric is uniquely qualified to help. For the past 15 months, he has been under the care of Dr. Miller, who has treated Eric through regular therapy sessions and drug treatment (Parnate, 3x per day). As Dr. Miller states, Eric now

> recognizes and fully accepts the severity of his wrongdoing at Wesleyan University and he has made extraordinary, even transformative, progress through extensive therapy, drug treatment, employment, and community service.

> . . . . His aim since high school had been to get a Ph.D. in neuroscience and to help develop more effective, targeted treatments for behavioral disorders.

> But for his felony conviction, this goal would not be unrealistic: Mr. Lonergan clearly is a brilliant young man, well read in many areas of study, and remarkably knowledgeable about psychoneuropharmacology. In addition to his brilliance, it is noteworthy that Mr. Lonergan has a strong desire to contribute to the welfare of his fellow human beings. . . . It has been therapeutic for him that in his job and his service to others, Mr. Lonergan has found he can feel like a valuable person by contributing appropriately to the lives of others through his experience and special expertise. Making a contribution to society is so important to Mr. Lonergan that I feel confident he will go on applying his talents toward the welfare of others.

**I sincerely believe that Mr. Lonergan has the capacity to make a major contribution to the field of psychoneuropharmacology, one that will enhance the well-being of countless people who suffer from mental illness**.

As Earl El-Amin Vice President, Program Development Adult Residential Program National Center on Institutions and Alternatives states,

> Many of the individuals in our program are on conditional release from Maryland state penal institutions set up specifically for inmates with mental disabilities.  Often, they are in trouble with the law as a direct result of substance abuse . . . Unfortunately, we are also dealing with an epidemic of our individuals getting addicted and/or physically harmed by synthetic cannabinoids ("K2" or "spice").  It is this subset of individuals . . . that I think will be the most impacted by [Eric's] speaking about the ramifications this kind of drug on his life.  As you may know, these chemicals are flooding our streets, jails, and prisons, and have been the cause of many deaths across the country, particularly recently with the introduction of newer and more dangerous versions of the drugs.  If Eric's example can keep even one person from continuing to use these chemicals, or from being tempted to try them, he has potentially kept them from serious harm or death.

> I hope that Your Honor will take into account Eric's selfless and valuable contribution to our organization and the individuals we serve.  I am convinced that if given the chance, he is going to continue to use his considerable talents to serve the community, and has taken this lesson to heart.

Dr. Angela Chambers, the Principal of a publicly funded school serving challenged children and teenagers in inner-city Baltimore, many of whom have serious emotional and/or intellectual disabilities, was equally effusive about Eric's efforts:

> I am thrilled that Eric came to NCIA to record his talk about the dangers of drugs and his mistakes that brought him to your honor's courtroom.  Frankly, I was skeptical about it at first; but once I learned more about his individual situation, I decided to give the young man a chance.  . . . Eric's speech was contrite, informative, and provided relatable stories from his own life to add up to his overall message to stay away from drugs.
>
> This is exactly the message my students need to receive -- . . . It provides a uniquely personal appeal to my students, something that is not found in much of the official materials on the subject.  I truly think that his message will help many of our students understand that their lives are at risk if they succumb to the negative influences that surround them on a daily basis.  Eric's effort might even keep some of them from taking that one wrong step that ends up putting them behind bars or worse.

Eric's work with underserved children at Washington, D.C.'s non-profit "For Love of Children" ("FLOC") has also been impressive

as FLOC's Executive Director and Program Coordinator have confirmed. (*See* Ex's 7 and 8.) [11]

Finally, as one of his mentors Majed Tomeh, the entrepreneur and former civil rights leader, aptly summarizes how Eric has literally been "brought to his knees":

> His pain was always palpable to me, and sometimes even a source of some discomfort in our meetings, though he appears to me to use enormous energy to keep the pain to himself and to channel it into positive action. (Ex. 11.)

**B. THE PURPOSES OF SENTENCING WOULD BE SATISFIED BY A NON-INCARCERATIVE, PROBATIONARY SENTENCE**

**1. As in the Recent Landmark Case of *United States v. Nesbeth*, the Collateral Consequences of Eric's Conviction <u>Would Make An Incarcerative Sentence Unduly Excessive</u>**

On May 24, 2016, Senior United States District Judge Frederic Block (Eastern District of New York) issued a groundbreaking Opinion, of great import to this and future analogous cases. In that case, *United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073 (E.D.N.Y. May 24, 2016), Defendant Nesbeth was convicted, *after a jury trial* (and thus *without* accepting responsibility for her crime), of

---

[11] Given Eric's proclivity for public service and his ability to literally "save lives," we have undertaken to prepare a proposed "Community Service Plan" for the Court's consideration, *see infra* at 78.

importation of a large quantity of cocaine (more than 600 grams) with intent to distribute.  Her advisory guideline range was 33-41 months (Level 20).  Judge Block described her criminal conduct as "serious" and "inexcusable," and the government sought a term of incarceration of 33-41 months.

Nevertheless, despite her "serious" and "inexcusable" criminality; despite her failure to cooperate; despite forcing the Government to take the case to trial; despite being convicted; and despite the absence of the many mitigating circumstances present here, the Court sentenced Ms. Nesbeth to a non-incarcerative sentence of one year of probation, with two special conditions:  6 months' home confinement and 100 hours of community service.

In so doing, the Court rendered a detailed, 41-page Opinion discussing its well-grounded, legal rationale:  that under 18 U.S.C. § 3553(a), a court should consider the "collateral consequences" of how felony convictions affect people's lives, and in *Nesbeth*, the collateral consequences faced by Ms. Nesbeth, *i.e.,* the loss of many relevant rights or privileges, were punishment enough.

Initially, the Court observed that "[t]here is a broad range of collateral consequences that serve no useful function other than to punish criminal defendants after they have completed their court-imposed sentences." *Nesbeth,* No. 15-CR-18 (FB), 2016 WL 3022073, at *1 (E.D.N.Y. May 24, 2016). It then traced the history of collateral consequences, observing that "The notion of 'civil death' – of the 'loss of rights . . . by a person who has been outlawed or convicted of a serious crime' – appeared in American penal systems in the colonial era, derived from the heritage of English common law." *Id. at *2.* (citing *Civil Death*, BLACK'S LAW DICTIONARY (10TH ED. 2014) AND *The Collateral Consequences of a Criminal Conviction*, 23 VAND. L. REV. 929, 942-949 (1970); Margaret Colgate Love, Jenny Roberts & Cecelia Klingele, COLLATERAL CONSEQUENCES OF CRIMINAL CONVICTIONS: LAW, POLICY AND PRACTICE 8 (2013 ed.). Today, the Court recognized, "the collateral consequences of a felony conviction form a new civil death. Convicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights." *Id.* at 3. Indeed, "in some ways, 'modern civil death is harsher and more severe' than traditional

civil death because there are now more public benefits to lose, and more professions in which a license or permit or ability to obtain a government contract is a necessity. *Id.* (citing Gabriel J. Chin, *The New Civil Death: Rethinking Punishment in the Era of Mass Conviction*, 160 U. PA. L. REV. 1789, 1794 (2012) (quoting *Avery v Everett*, 18 N.E. 148, 150 (N.Y. 1888)).

Next, under the heading "Modern Reform Efforts," the Court noted that:

> The ebb and flow of efforts at reform are tiding back towards dismantlement of collateral consequences and civil death. President Barack Obama, for one, has taken steps by executive order to help felons rehabilitate and reintegrate into society. For example, he has ordered federal agencies to "ban the box," i.e., not ask prospective employees about their criminal histories early in the application process. Additionally, the President has voiced his support for the Sentencing Reform and Corrections Act of 2015, which has received bipartisan support in the Senate. . . . [12] *Id.*

---

[12] *See generally* Peter Baker, *Obama Moves to Ease Path for Ex-Prisoners Seeking Jobs at Federal Agencies*, N.Y. TIMES, Nov. 3, 2015, at A20. *See* S.2123 - Sentencing Reform and Corrections Act of 2015, CONGRESS.GOV (listing bipartisan cosponsors); *See id.* (bill summary prepared by the Congressional Research Service); American Bar Association, Nat'l Inventory of Collateral Consequences of Conviction, abacollateralconsequences.org; Letter from Attorney General Eric Holder to State Attorneys General (Apr. 18, 2011), available at http://csgjusticecenter.org/wp-content/uploads/2014/02/Reentry_Council_AG_Letter.pdf.

Judge Block went on to cite new, "substantial efforts to alleviate the detrimental effects of collateral circumstances," *see e.g.,* ABA STANDARDS FOR CRIMINAL JUSTICE, COLLATERAL SANCTIONS AND DISCRETIONARY DISQUALIFICATION OF CONVICTED PERSONS, §§ 19-2.2, 3.1, but concluded that despite "these efforts at reform, felony convictions continue to expose individuals to a wide range of collateral consequences imposed by law that affect virtually every aspect of their lives." *Id.* at *5. Indeed, as Judge Block stated, there are "nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disdavantages on convicted felons." [13] Finally, Judge Block confirmed that courts within the Second Circuit have embraced collateral consequences "as bearing upon the concept of 'just punishment'" under 18 U.S.C. § 3553(a). *Id.* at 7.

In *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), for example, the district court imposed 20-month sentence despite a

---

[13] *See generally* American Bar Association, Nat'l Inventory of the Collateral Consequences of Conviction, abacollateralconsequences.org.

guideline range of 78-97 months because the "conviction made it doubtful that the defendant could pursue his career as an academic or translator, and therefore that the need for further deterrence . . . is lessened because the conviction itself already visits substantial punishment on the defendant." *Id.* at 141. The Second Circuit affirmed, because the district court's analysis was "required by section 3553(a)," and "It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *Id.* at 141-42.

More recently, in *United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014), the Second Circuit rejected the Government's contention that collateral consequences (in that case, the defendant's deportation) should not be considered by a sentencing judge. As the Second Circuit explained in affirming a *132-month reduction* below the guideline range,

> In determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact of deportation will have on the defendant and his family.

*Id.* at 262-63.

Against this backdrop, Judge Block concluded that the collateral consequences faced by Ms. Nesbeth (including ineligibility for grants, loans and work assistance for two years; denial of federal housing assistance; denial of travel rights during supervised release; suspension of driver's license; and the potential disqualification from federal employment) warranted a sentence of probation. *Id.* at *8-10.

In this case, the collateral consequences faced by Eric are harsh, indeed, they appear to exceed those faced by the defendants in *Stewart*, *Thavaraja*, and Nesbeth. Putting aside the very real consequences from which Eric has *already* suffered, following are several of the *additional* collateral consequences at issue:

- With regard to becoming a teacher, ineligibility for grants, loans, and work assistance for two years (the duration of his college career) (20 U.S.C. 1091)

- The extremely punitive nature of this collateral consequence cannot be overstated, given Eric's unique talents and his dreams of going into academia. As the Government candidly acknowledged in *Nesbeth*, a case in which the defendant's teaching goals were more modest than those here, "the defendant now has a felony record that will undoubtedly create challenges for her in the future, particularly with respect to her stated goal of becoming a teacher." *Nesbeth,* No. 15-CR-18 (FB), 2016 WL 3022073, at *13 (E.D.N.Y. May 24, 2016)

- **Ineligible "for the issuance of any grant, contract, loan, professional license, or commercial license provided by an agency of or appropriated by funds of the United States" (21 U.S.C. 862)**

- **Denial of passport and ability to travel (This is a particularly relevant consequence for Eric because his father, brother, girlfriend, and many of his friends reside in Brazil, where he was raised and where his mother's family still resides; moreover, an academic or research career requires overseas travel) (22 U.S.C. 2714)**

- **Permanent ineligibility for employment with a manufacturer, distributor, or dispenser controlled substances (21 C.F.R. 1301.71)**

- **Permanent ineligibility for employment with a reverse distributor of controlled substances (21 C.F.R. 1301.74)**

- **Ineligible for employment with registered drug manufacturer, distributor, or dispenser (21 C.F.R. 1301.76)**

- **Ineligible to purchase chemicals that could be used to manufacture drugs (21 C.F.R. 1310.21)**

- **Ineligible for employment with any regulated seller of scheduled listed chemical products (21 C.F.R. 1314.50)**

- **Revocation/Debarment from grants and financial assistance (Office of National Drug Control Policy) (21 C.F.R. 1405.300)**

- **Ineligible for employment with pharmaceutical third-party logistics provider (21 U.S.C. 360eee-3)**

- **Ineligible for registration to manufacture, distribute, dispense, or conduct research with controlled substances (21 U.S.C. 823)**

- **Revocation/Debarment from grants and financial assistance (National Science Foundation)**
- **Ineligible for federal employment (5 U.S.C. 3113)**

- **Ineligible to petition for relative's immigrant status (8 U.S.C. 1154)**

- **Revocation of driver's license for at least six months (23 U.S.C. 159, 23 CFR 192.4)**

**Further, an academic or research career (Eric's dream) requires overseas travel. As a result of his conviction and status, Eric will likely be permanently banned from entering several foreign countries, including Canada, Australia, and England. [14]**

**In short, under 18 U.S.C. 3553(a), this Court should consider the serious and in many cases permanent collateral consequences that Eric will face (and in several cases that he has *already* faced as a result of his conviction). Indeed, as the Second Circuit stated in**

---

**[14] As discussed in *Nesbeth*, in addition to these collateral consequences, Eric will also be subject to collateral consequences under the laws of the state of any period of probation or supervised release, which depending upon the state at issue, may include inability to complete this education. At the Court's request, these can be provided to the Court.**

*Stewart*, this analysis "is required by section 3553(a)."[15]  *Stewart*, 590

F.3d at 141-142.  We respectfully submit that, under the

circumstances and given the draconian nature of the collateral

consequences at issue, compacting these consequences with any

period of incarceration would constitute an unduly harsh and

excessive punishment.

> 2.  The Factors Under 18 U.S.C. § 3553(a) Support
>     <u>a Non-Incarcerative, Probationary Sentence</u>

A jail sentence -- even a short one -- at this point in Eric's life will

derail the extraordinary progress he has made, while accomplishing

little that has not already been accomplished since his arrest,

expulsion from college, federal indictment, and guilty plea.  Section

3553(a) requires sentencing courts to impose a sentence "sufficient,

---

[15]  We attach in this regard a letter from leading (unpaid) expert Professor Gabriel Chin, whose work was cited by in *Nesbeth*, *see, e.g.*, Gabriel J. Chin, Race, *The War on Drugs, and the Collateral Consequences of Criminal Conviction*, 6 J. GENDER, RACE, & JUSTICE 252 (2002).  Ex. 41.  As Professor Chin states, "My research shows that many of the most significant collateral consequences are associated with drug convictions . . . .  Given, among other things, [Eric's] aspirations and my review of letters submitted on his behalf by several Wesleyan University faculty members, the collateral consequences applicable to Mr. Lonergan are likely to be substantial."  *Id.*

*but not greater than necessary*" to comply with the purposes set forth in paragraph 2. Section 3553(a)(2) states that such purposes are:

> **(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**
>
> **(B) to afford adequate deterrence to criminal conduct;**
>
> **(C) to protect the public from further crimes of the defendant; and**
>
> **(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

In assessing the need for a just punishment under 18 U.S.C. § 3553(a)(2)(A), "punishment must not be draconian; the judge who sentences must be sensitive to both the goals of society reflected by the efforts of the government, and special circumstances of those awaiting sentence. The judge must sentence in a manner that reflects [her] role as the implementer of society's search for justice, as reflected by due and timely punishment of those who transgress, without ever being indifferent to a defendant's plea for compassion, for compassion also is a component of justice." *United States v. Kloda*, 133 F. Supp. 2d 345, 348 (S.D.N.Y. 2001).

As the above factors relate to drug offenses, the Department of Justice and courts in this circuit routinely recognize that incarceration should be reserved for "violent criminals, career criminals, or those who use weapons when committing drug crimes." *See, e g.*, Attorney General Eric Holder's testimony before the United States Sentencing Commission, March 13, 2014. In his testimony before the sentencing commission, the Attorney General asked us to ask "serious questions" in drug sentencings: "Are we using our limited jail space to incarcerate the right people? Are we not making better use of alternatives to incarceration and prosecution?" *Id*.

Against this backdrop, there is little good reason to send Eric Lonergan to jail. Eric has already been deterred and poses no risk of recidivism. In the 15-plus months since his arrest, Eric transformed himself. He no longer uses drugs. He has obtained medical treatment for his Bipolar Disorder, and his prognosis is excellent. He has performed almost 200 hours of community service, which has not only been very rewarding to him but more importantly, he has already positively affected many other lives. Ex's 7-11, 19-21.

Further, he is employed.  He lives with and has the full support of and love from his mother.  He has a stable, healthy relationship with a new girlfriend.  And he is working with a mentor, Mr. Tomeh, to build a company.  There is no question that Eric does not need a prison term to deter him from future criminality or otherwise rehabilitate him.

Eric has also been heavily punished.  While a jail sentence would add to the punitive aspect of his conviction, under the circumstances, it would be unduly harsh and excessive.  Eric, and Eric alone, is responsible for his misconduct.  But for that misconduct, he would be in graduate school obtaining an advanced degree in neuroscience and looking forward to a potentially-groundbreaking career in his chosen field.  Instead, Eric is and always will be a convicted felon.  His name and face will forever be publicly available on the internet branding him as a drug dealer and convicted felon.  Putting aside the shame and humiliation of these facts, their practical effects are also enormous.  They will impact his ability to get a degree and job in his field of expertise or to teach, in addition to the numerous other collateral consequences at issue.  *See, e.g., See*

***United States v. Nesbeth***, No. 15-CR-18 (FB), 2016 WL 3022073 (E.D.N.Y. May 24, 2016); *see supra* at 75-85. As Eric's physician and professors have attested, not only would this be tragic for Eric, it would also deprive society of the very real benefits that Eric could provide as a result of his brilliance. In view of the already severe consequences Eric has faced and those that he will continue to face, as in *Nesbeth*, any additional punishment that would include prison would be far harsher than necessary.

As to general deterrence, even before sentencing, Eric's story and his service have served as powerful general deterrents. His story has been heavily publicized and shared on college campuses locally, and nationally. What college kid wants to be arrested? What college kid wants to be indicted, federally, by the Justice Department? What college kid wants to be a federal convicted felon? The answer, of course, is none, and adding a prison sentence would not increase the deterrent value of Eric's tragic story.

Moreover, as the annexed letters attest, through his community service, Eric has *already* deterred others from entering or returning to lives of substance abuse or drug dealing. Ex's 9-10, 19-21.

Additionally, incarceration is not required to provide Eric with "needed educational or vocational training, medical care, or other correctional treatment." In fact, Eric is in much-needed treatment, and incarceration would deprive him of that.

In this case, a non-incarcerative, probationary sentence is an appropriate for of punishment, particularly when viewed in the context of the collateral consequences Eric has already suffered and will continue to suffer for the rest of his life. *See United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073 (E.D.N.Y. May 24, 2016); *see supra* at 16-17, 82. [16]

---

[16] Finally, given the youth and immaturity of the class of potential offenders at issue (high school or college-aged kids), there is little to support that jail would have any additional deterrent effect. *See generally Miller v. Alabama*, 132 S. Ct. at 2464 ("nor can deterrence do the work in this context, because 'the same characteristics that render juveniles less culpable than adults' – their immaturity, recklessness, and impetuosity – make them less likely to consider potential punishment") (citation and quotation omitted).

Further, many colleges, and Wesleyan, in particular, have a history of turning a blind eye to drug use on campus. It is well known, for example, that students openly take drugs during "DUKE" and "ZONKER HARRIS" days on campus with little or no repercussion. This case, hopefully, will have an impact on Wesleyan and the enforcement of its drug policies in the future. But again, incarcerating Eric would be gratuitous in that regard.

## C.    THE KINDS OF SENTENCES AVAILABLE

This Court has the authority and discretion to consider a wide range of alternatives to the lengthy term of imprisonment suggested under the advisory guidelines.  18 U.S.C. §§ 3553(a)(3), 3561(a)(1).

In fact, Section 3553(a)(3) specifically directs the judge to consider sentences *other than* imprisonment, and the severity of a probationary sentence should not be underestimated.  As the Supreme Court stated in *Gall*:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.  *See United States v. Knights*, 534 U.S. 112, 119 (2001) ('Inherent in the very nature of probation is that probationers do not enjoy the absolute  liberty to which ever citizen is entitled.') (*quoting Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)).  Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excess drinking. U.S.S.G. § 5B1.3. Most probationers are also subject to individual 'special conditions' imposed by the court.

**552 U.S. at 48 (footnote omitted);** *see also Griffin v. Wisconsin*, 483

**U.S. 868, 874 (Probation, like incarceration, is "a form of criminal**

**sanction");** *United States v. Knight***s, 534 U.S. at 112 (2001).**

**("Inherent in the very nature of probation is that probationers "do not**

**enjoy 'the absolute liberty to which every citizen is entitled.")**

      1.     **A Sentence of Probation with**
                <u>**Home Confinement is Appropriate**</u>

      **The Court may also consider a sentence of probation with a**

**period of home detention, which has been defined by the Guidelines**

**as:**

> **[A] program of confinement and supervision that restricts**
> **the defendant to his place of residence continuously,**
> **except for authorized absences, enforced by appropriate**
> **means of surveillance by the probation office. When an**
> **order of home detention is imposed, the defendant is**
> **required to be in his place of residence at all times except**
> **for approved absences for gainful employment, community**
> **service, religious services, medical care, education or**
> **training programs, and such other times as may be**
> **specifically authorized. Electronic monitoring is an**
> **appropriate means of surveillance and ordinarily should be**
> **used in connection with home detention. However,**
> **alternative means of surveillance may be used so long as**
> **they are as effective as electronic monitoring.**
> **U.S.S.G. § 5F1.2 (Commentary).**

      **18 U.S.C. § 3561(c)(1) authorizes a sentence of probation with**

**special conditions in this case. Moreover, a number of defendants**

have received sentences of probation after demonstrating characteristics and circumstances similar to a number of those present in this case. *E.g.*, *Howe*, 543 F.3d at 130-31 (affirming below guideline sentence of probation and home confinement on wire fraud convictions); *United States v. Moore*, 344 Fed. Appx. 767, 768-69 (3d Cir. 2009) (affirming sentence of probation and home detention despite guideline range of 18 to 24 months based on defendant's lack of criminal history and cooperation with the government).

    2.    <u>Support for Community Service Sanction</u>

Given the mandate of 18 U.S.C. § 3553(a)(3) for the Court to consider "the kinds of sentences available," a sentence of probation conditioned upon a substantial community service order would adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for Eric.

In 2005, the Administrative Office of the U.S. Courts described community service as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community.  It is practical, cost-effective, and fair — a 'win-win' proposition for everyone involved."  *Court & Community: An Information Series*

*About U.S. Probation & Pretrial Services: Community Service*, Office of Probation and Pretrial Services, Administrative Office of the U.S. Court (2005).

It is recognized that "[c]ommunity service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation. . . . It restricts offenders' personal liberty[,] . . . allows offenders to atone or 'make the victim whole' in a constructive way[, and] . . . may be regarded as . . . a form of symbolic restitution when the community is the victim." *Id.*

In selecting an appropriate candidate to perform community service, U.S. Probation and Pretrial Services recommends:

> Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service. . . . Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence. *Id.*

Specific to probation, while the Supreme Court in *Gall* recognized that "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms," it further noted that probation is serious:

Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights*, 534 U.S. 112, 119 (2001) ('Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which ever citizen is entitled.') (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)).

In April 2010, the United States Sentencing Commission submitted to Congress proposed amendments, which went into effect November 1, 2010. One of the results of those amendments was to increase a judge's ability to impose sentences that include alternatives to incarceration. In its official submission to Congress, the Sentencing Commission explained:

The amendment is a result of the Commission's continued multiyear study of alternatives to incarceration. The Commission initiated this study in recognition of increased interest in alternatives to incarceration by all three branches of government and renewed public debate about the size of the federal prison population and the need for greater availability of alternatives to incarceration for certain nonviolent first offenders.

*Amendments to the Sentencing Guidelines, Policy Statements, and Official Commentary* at 2-3 (April 30, 2010).

Sentencing judges recognize that community service can serve as a significant sanction. In a major fraud case in the Eastern District

of New York, Judge John Gleeson eloquently addressed the value of community service:

> The prospect of a sentence that does not include incarceration, which is explicit in the papers submitted by your lawyers, is a daunting one for no other reason than it might fail to promote respect for the law which is one of the things a sentence must do for someone who participated so integrally in a fraud from, as far as your piece of it is concerned, cost financial institutions, what, $110 million. ******

> In fact, you know, one might say how could, no matter how essential you were to the prosecution of the more culpable participants in this crime, how do you justify an intelligent, accomplished businessman such as yourself committing this type of crime and not being sent to jail, not being, having the punishment include that type of condemnation, the most significant form of condemnation a sentencing judge in a financial crime can mete out?

> But nothing should ever be out of bounds and I've struggled with your lawyer's request, struggled with it throughout the presentations I've heard here, and I conclude that a sentence that doesn't include incarceration is appropriate here. Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its nature, given your age and your physical circumstances. I don't think the goals of sentencing here require you to be incarcerated.

> I am placing you on probation for a period of five years. One special condition of probation would be that you be in home detention for a period of six months.
>
> Another is that you perform 500 hours of community service. It strikes me that you can do some good in your community. You already have. It seems to me you deserve it. The combination of circumstances in your case makes you worthy of serving your punishment in a manner that's a little more constructive than going to jail.

Sentencing Transcript from *United States of America v. Shamilzadeh*, 04-CR-194 (JG), E.D.N.Y. (2008).

Like the defendant in *Shamilzadeh*, Eric is an outstanding candidate for community service. He is a first-time offender, he has no history of violence, and he is highly motivated to continue aiding his community -- as is evident from the attached letters describing his already extensive contribution of his time to organizations in need and the people they serve. Rigorous and appropriately structured community service will serve the needs of justice very effectively in this case, by taking his time and expertise and putting them to use in a constructive and useful manner.

A sentence of probation conditioned upon substantial community service effects the best use of his talents, intelligence, and work ethic to benefit organizations such as the Penn North

Recovery Center, located in one of the most challenged neighborhoods in Baltimore, Maryland (across the street from the epicenter of the Freddy Gray unrest: the CVS that was burned to the ground). The attached letter from Dr. Steve Dixon, the Executive Director of Penn North Recovery, provides details of what they do for the community, and how Eric's labor will be utilized by that worthwhile organization. (*See* Ex. 41.)

In short, if the Court decides to condition probation on Eric doing hundreds of hours of work for Penn North, it will not be easy. Eric's intellect, computer, and technical knowledge will be utilized to full effect and be of great benefit to Penn North, but he will also have to do whatever other duties may arise. Furthermore, as part of Dr. Dixon's proposal to the Court, Eric will also be expected to regularly participate in the Narcotics Anonymous meetings held at the Center.

Eric is committed to doing whatever he can to make amends to society, and is hopeful that the Court will allow him to pursue the opportunity with and outside the Penn North Recovery Center.

## D.    AVOIDING UNWARRANTED SENTENCING DISPARITIES

1.    Eric's Co-Conspirator Zach Kramer,
       Who Distributed the "Molly" that Led to the 2015

**Hospitalizations, Received a Sentence of 4 Months
in Prison and 8 Months Home Confinement**

Pursuant to 18 U.S.C. 3553(a)(6), the Court should consider the

sentences of similarly-situated defendants in fashioning an

appropriate sentence to avoid unwarranted disparities.  In this case,

there are several such defendants, and it is proper to note that they all

received sentences well below the advisory guidelines range.  *See*

*United States v. Brennan*, No. 96-CR-793 (JBW), 2007 WL 14590

(E.D.N.Y. Jan. 2, 2007) (considering the disparity between state and

federally charged defendants under § 3553(a)(6)); *see also United*

*States v. De La Cruz*, No. 09-4641-CR, 2010 WL 4136669 (2d Cir. Oct.

21, 2010) (noting that a Guidelines sentence may result in

unwarranted disparities).  In fact, several received probation.

Initially, Eric and his co-defendant Zachary Kramer plead guilty

to the same single count of conspiring to distribute MDMA.  They

were co-conspirators.  And while Eric fully accepts responsibility for

his actions, it bears repeating that Mr. Kramer, not Eric, sold the

drugs that led to the February, 2015 hospitalizations.  In fact, as the

Government has acknowledged, as of late 2014, Mr. Kramer "took

over."

The starting point is the Indictment itself, which states that:

- **"In or about December 2014 KRAMER took over for LONERGAN as the primary supplier of Molly at Wesleyan**. KRAMER charged similar prices as LONERGAN, but also sold Molly in bulk quantities. Indictment, Par. 11.)

- **"In January 2015, KRAMER returned to the Wesleyan campus with at least 25 grams of Molly. He provided the Molly to some of his friends for redistribution to other students on campus."** (Indictment, Par. 12.)

- On February 21, 2015, eleven individuals, including ten Wesleyan students, overdosed on substances they believed was Molly, and many were transported to the hospital. . . . **All of these students obtained the purported Molly through individual distributors who were supplied directly by KRAMER**. (Indictment, Par. 13.)

Despite the above, it is clear from a review of Defendant Zachary Kramer's Sentencing Memorandum and the Transcript of his Sentencing Hearing that Mr. Kramer's counsel made a concerted effort to deflect blame and "throw Eric under the bus." Although perhaps understandable, that strategy was not appropriate, particularly because their presentations contained several inaccuracies. To its great credit, the Government noted and corrected these inaccuracies.

***First,*** as the Government stated at Mr. Kramer's Sentencing Hearing, contrary to Kramer's counsels' statements to the Court, "Mr. Kramer [not Eric] recruited those sellers in January 2015. We met with them. [Kramer] specifically recruited them. Not Eric Lonergan." (May 5, 2016 Transcript of Kramer Sentencing Hearing ("Tr."), at 99.)

***Second,*** as the Government correctly stated, "Mr. Kramer [not Eric] is the one who talked to them about the pricing structure, a pricing structure which contemplated a profit of $400 per bag at six bags of five grams. That's a 2,400 profit for Mr. Kramer. That's simply what the facts are." (*Id.*)

***Third***, as the Government correctly stated, "Mr. Kramer, the text messages off of his phone . . . show that he was texting about purchasing MDMA down in DC [independently from Eric] in August before he got to school in September." (*Id.* at 100.)

***Fourth,*** as the Government correctly stated, Eric was not the one in 2015 who "got[] four dealers together, split up five grams at time, g[ave] [Kramer's dealers] a price structure. Absolutely not. . . . That was Mr. Kramer." (*Id.*)

***Finally***, the Indictment also makes clear that, although Kramer was not charged with it, nor was his offense conduct enhanced under the guidelines, after the February 2015 overdoses, Kramer tried to obstruct justice:

> After the events of February 21, 2015, KRAMER met with at least one of his distributors and directed him not to speak to the police.  In addition, in text messages sent to other students who were questioning KRAMER about the substance causing the overdoses, KRAMER blamed one of his distributors and falsely claimed that the distributor was the source of the purported Molly.  (Indictment, Par. 14.)

The Government's position regarding the above was entirely consistent with the its December 15, 2015 Version of Offense Conduct, wherein the Government confirmed:

> [I]n or about December 2014, Kramer took over for Lonergan as the primary supplier of MDMA at Wesleyan . . .

With regard to Kramer's obstruction (with which he was neither charged nor enhanced), the Government stated:

> After the overdoses, Kramer contacted all of the individuals to whom he had provided MDMA and directed them to destroy the substance.  He also sent several text messages to friends denying that he had any involvement in the distribution of the substance that caused the overdoses and attempt[ed] to place blame on others, including one of the individuals who had been hospitalized as a result of ingesting the Molly.

It bears repeating, Eric was a drug dealer.  His conduct was illegal.  He sold drugs to Kramer and he accepts full responsibility for his dangerous misconduct.  But as the Government has confirmed, the following also is clear: (i) Eric had effectively stopped dealing by late 2014; (ii) Kramer, not Eric, was the primary supplier at Wesleyan as of early 2015; (iii) Kramer, not Eric, recruited four dealers to work for Kramer; (iv) Kramer, not Eric, set up the profit structure referenced in the Indictment; and (v) Kramer, not Eric, sold the drugs at issue in 2015.  Further, while not charged or enhanced with obstruction, Kramer, in effect, attempted to obstruct justice.

2.     **Other College-Aged Defendants Recently Convicted of Distributing "Molly" Received Non-Incarcerative Sentences**

Several recent "Molly" distribution cases further support a non-incarcerative sentence here, including two in which victims tragically died.  In *United States v. Mora*, No. 14-CR-00142 (S.D.N.Y. Dec. 28, 2015), for example, the defendant pled guilty to conspiracy to possess with intent to distribute MDMA.  Mora was a college student who (like Eric) conspired with another student to distribute "Molly."  Mora (like Eric) had a history of depression and other mental health issues.  The

Government recommended a sentence of 30-37 months, but District Judge William Skretny instead sentenced Mora to time served, six months' home confinement, and two years' supervised release.[17]

*United States v. Morgan*, No. 14-CR-00582 (S.D.N.Y. Mar. 17, 2015), is even more compelling -- in that case, the defendant's MDMA killed someone. Defendant Patrick Morgan, was Eric's age (22) at the time of his misconduct. Unlike Eric, Morgan had no apparent mental health issues in his background. Morgan had a history of dealing narcotics and MDMA to at least three individuals; in August of 2013, he sold them ten "Molly" pills. The three individuals took the Molly at a concert. One of them collapsed and died in the hospital later that night. Despite the tragic consequences of Morgan's illegal conduct and the prosecution's request for a sentence of 10-16 months in jail, U.S. District Judge Edgardo Ramos imposed no prison time. Morgan

---

[17]  *See* Gov. Resp. to Def.'s Sent. Mem., at 1, *Mora*, ECF No. 53; Def.'s Sent. Mem., at 3, *Mora*, ECF No. 52; Judgment at 2-4, *Mora*, ECF No. 57.

received a sentence of 8 months' home confinement, 3 years'

supervised release, and 500 hours of community service. [18]

These cases reinforce that a typical result for young, remorseful,

first-time offenders with histories and characteristics like (but not

necessarily as compelling as) Eric is a non-incarcerative sentence.[19]

---

[18] *See* Def. Sent. Mem. at 5, ECF No. 19; Gov. Ltr. Re Sent. at 1, *Morgan*, ECF No. 24; Judgment at 4, *Morgan*, ECF No. 26; *see also United States v. Melton*, No. 15-CR-20755 (S.D. Fla. May 23, 2016) (defendant law student facing guidelines range of 151 to 188 months and prosecution request of 8-years received a 30 month sentence, even though he imported some *40 kilos* of Molly, participated in a large-scale drug ring, and did not plead or cooperate -- instead he went to trial, twice). Def.'s Sent. Mem. at 6, ECF No. 421. *See* David Ovalle and Jay Weaver, Miami Herald, May 13, 2016.

[19] *Morgan* and *Mora* are not the only cases where defendants who distributed Molly received no prison time. *See*, *e.g.*, Lance Benzel, 'MadChemist' Who Dealt Drug that Killed Colorado Springs Teen Gets 6 Years Probation, The Gazette, May 18, 2016, http://gazette.com/madchemist-who-dealt-drug-that-killed-colorado-springs-teen-gets-6-years-probation/article/1576372; Final Plea in NY Drug Ring Case on Columbia Campus, Fox News U.S., January 17, 2012, http://www.foxnews.com/us/2012/01/17/final-plea-in-ny-drug-ring-case-on-columbia-campus.html (Wymbs, a Columbia University student who sold Ecstasy and LSD and who had a history of depression, heavy drinking, and drug use, was sentenced to five months' probation after a widely-publicized drug bust of five students); Everything You Need to Know About Operation Ivy League, BWOG Columbia Student News, August 31, 2011.

## E.    SENTENCING GUIDELINES

As discussed above and as we will discuss at the Sentencing Hearing, in view of Eric's history and characteristics, we respectfully submit that the guideline range is of minimal import here.  Moreover, even before *Booker*, courts had discretion to depart below the guideline range in atypical cases.  "When a court finds an atypical case, one to which a particular guideline linguistically applies, but where conduct significantly differs from the norm, the court may consider whether a departure is warranted."  U.S.S.G. § 1A1.1, Cmt. 4(b); *see* U.S.S.G. §5K2.0(a)(2).[20]

## F.    CONCLUSION:  A SENTENCE OF PROBATION WITH STRINGENT SPECIAL CONDITIONS IS APPROPRIATE AND JUST UNDER THE CIRCUMSTANCES

As the Court considers what constitutes a reasonable sentence under Section 3553(a), we ask that it bear in mind the Supreme

---

[20] The Sentencing Commission contemplated that a combination of factors could warrant a downward departure: "The Commission does not foreclose the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances, differs significantly from the heartland of cases covered by the guidelines . . . even though none of the characteristics or circumstances do individually.  Section 5K2; *see also United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (district court did not abuse its discretion by departing downward from Level 20 to Level 10).

Court's admonition that "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S.Ct. at 1240 (internal quotations omitted). Further, as the Supreme Court observed in *Koon v. United States*, 518 U.S. 81, 113 (1996), "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

Eric is paying dearly for his mistakes and will continue to do so for the rest of his life. He does not seek to diminish the gravity of his dangerous conduct, but he respectfully asks the Court to consider all of the facts detailed in this Memorandum. The following facts provide a strong basis for non-guidelines variance in this case: (i) Eric's family history of Bipolar Disorder; (ii) Dr. Miller's conclusion that Eric's Bipolar Disorder caused the offense conduct; (iii) Eric's otherwise exemplary character and good deeds, even at his young age, for his friends, peers, and classmates; (iv) an evaluation of the collateral consequences at issue for Eric -- including his inability to travel, teach, or likely attend graduate school in his chosen field -- as

recently discussed in *United States v. Nesbeth*; (v) Eric's transformation and extensive community service, which is approaching 200 hours; and (vi) Eric's apparently-unique intellect, which as discussed by five esteemed Wesleyan University professors, can be utilized to help society.

Under the circumstances, a sentence of probation conditioned upon a substantial community service order would adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment, while sending Eric to prison would add no deterrent effect beyond the significant impact this case has already had. Eric's history and personal characteristics are significant mitigating factors and, coupled with *Nesbeth* and the other factors above, provide compelling support for a non-incarceration sentence.

On behalf of Eric, his parents, and his family, we respectfully plead with the Court to spare Eric from prison.

Dated this 22nd day of August, 2016

Respectfully submitted,

DEFENDANT ERIC LONERGAN

By: /s/ _____
Mathew S. Rosengart
rosengartm@gtlaw.com
(Pro Hac Vice Admitted)
Greenberg Traurig, LLP
1840 Century Park East
Los Angeles, CA  90067
Tel: (310) 586-3889
Fax: (310) 586-7800

Michael Sklaire [CT19503]
sklairem@gtlaw.com
Greenberg Traurig, LLP
1750 Tysons Blvd., Suite 1000
McLean, Virginia  22102
Tel: (703) 749-1308
Fax: (703) 714-8303

## CERTIFICATION

I hereby certify that on August 22, 2016, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: /s/_____
Michael Sklaire [CT19503]
sklairem@gtlaw.com
Greenberg Traurig, LLP
1750 Tysons Blvd., Suite 1000
McLean, Virginia 22102
Tel: (703) 749-1308
Fax: (703) 714-8303