**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Crim. No. 3:15cr85(VLB)** |
| **v.** | |
| **ERIC LONERGAN** | **August 26, 2016** |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The government respectfully submits this sentencing memorandum in connection with the defendant Eric Lonergan's ("Lonergan") sentencing hearing on September 1, 2016.   For the reasons set forth below, the government asks that the Court adopt the findings of fact in the Pre-Sentence Report ("PSR"), conclude that the guideline range for the offense is 30-37 months' incarceration, and impose an incarceration term at the bottom of that range.

I.   **BACKGROUND**

On May 21, 2015, a federal grand jury in New Haven returned a five-count Indictment against Eric Lonergan and Zachary Kramer charging various narcotics offenses in connection with their distribution of a substance they claimed to be MDMA ("Molly") at Wesleyan University in 2014 and 2015.   In particular, the Indictment charged Lonergan with conspiracy to distribute MDMA, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846 (Count One), attempted distribution of MDMA and actual distribution of AB Fubinaca, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count Two), and distribution of MDMA within 1000 feet of a private college, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 860 (Count Four).

1

The charge in Count Four carried a mandatory minimum incarceration term of 12 months and doubled the maximum incarceration term to 40 years.   Though the allegations in the Indictment also supported a charge that Lonergan distributed MDMA to individuals who were under 21 years-old, which would constitute a separate crime under 21 U.S.C. § 859, the Indictment did not allege this offense. Lonergan surrendered himself at the United States courthouse on May 22, 2015 and was released on bond.   He has remained compliant with the conditions of his release during the pendency of this case.

On November 30, 2015, Lonergan changed his plea to guilty as to Count One of the Indictment.   In doing so, he entered into a written plea agreement.   In that agreement, the parties stipulated that Lonergan conspired to distribute more than 80 grams, but no more than 120 grams, of MDMA, which is the equivalent of between 40 and 60 kilograms of marijuana, and results in a base offense level of 18.   As to quantity, the parties included the following:

> The parties agree and acknowledge that, based on toxicology tests conducted of the small amount of suspected MDMA seized by the Middletown Police Department in February 2015, much of the substance distributed by the defendant between November 2013 and February 2015 did not contain MDMA, but, instead contained a mixture of AB Fubinaca, which is a Schedule I controlled substance, and 6-MAPB, which is not a controlled substance, but is an analogue of MDMA. Because the defendant conspired to distribute a substance he represented to others to be MDMA, the determination of quantity for the calculation under the Sentencing Guidelines will be based on the quantity of MDMA which he conspired to distribute.

The parties also agreed on a two-level increase because Lonergan sold MDMA at Wesleyan University, which is a private college, and a two-level increase

for Lonergan's supervisory role in the offense, for an adjusted offense level of 22. Lonergan's role also disqualified him for a safety valve reduction.[1] After a three-level reduction for acceptance of responsibility, Lonergan's total offense level was 19 and his guideline incarceration range, based on a Criminal History Category I, was 30-37 months.

Both sides reserved their rights to seek a sentence above or below that range. Lonergan waived his right to appeal or collaterally attack his sentence provided that the sentence did not exceed 37 months, a three-year term of supervised release and a $1 million fine.

Had this case proceeded to trial, the government would have proven the following facts.[2] From November 2013 through February 2015, which are the dates listed in Count One of the Indictment, Lonergan and Kramer were students at Wesleyan University in Middletown, Connecticut.  In or about November 2013, Lonergan began selling a substance he referred to as both "Molly" and MDMA, a Scheduled I controlled substance, to other students at Wesleyan.  The sales

---

[1] Even without a role enhancement, Lonergan likely would not have qualified for the safety valve reduction. The Court already concluded that Kramer, who did not receive a role adjustment and for whom the government recommended the reduction, did not qualify for safety valve because his offense conduct resulted in serious physical injury to another person.

[2] These facts are based on the evidence the government would have presented had this case gone to trial, including the anticipated testimony of law enforcement officers and various identified cooperating witnesses, including many students who purchased purported MDMA from Lonergan and Kramer, various electronic communications, including saved text messages and PrivNote messages, as well as various seized controlled substances.

occurred most often at Lonergan's dorm rooms.   He charged approximately $20 per .1 gram of Molly. Lonergan often conducted presumptive chemical tests on the Molly he distributed to prove to his customers that it was high-quality MDMA.

Lonergan sometimes counseled students on how to ingest safely Molly and other psychedelic drugs.   At one point in 2014, after the Wesleyan administration sent out a campus-wide communication warning of the dangers of ingesting controlled substances like Molly, Lonergan authored and distributed a pamphlet instructing students about the use of psychedelic drugs.

In or about September 2014, Kramer began purchasing and reselling a substance he knew as "Molly" and which he believed to be ecstasy or MDMA. Kramer was supplied with bulk quantities of MDMA by Lonergan.   As he did for other students, at times, Lonergan used a chemical test on the substance he sold Kramer to prove to him that he was selling Kramer high-quality MDMA. After obtaining the bulk quantities of MDMA from Lonergan, Kramer separated it into smaller quantities and re-sold it to students at Wesleyan.   These sales occurred on Wesleyan's campus.

In September 2014, Lonergan was the source of Molly for several students who were planning a "rolling" party at Wesleyan, which is a party where guests ingest Molly.   He provided several grams of a substance he represented to be MDMA, in bulk, to Rama Al Nakib, who then distributed it to students in .1 gram capsules.   During the course of this transaction, Lonergan made it clear through text messages to Al Nakib that he was the one who would set the per gram price

4

for the MDMA and that anyone interested in purchasing one gram or more of MDMA had to come and get it directly from him.   At this party, which occurred on or about September 13, 2014, several students became ill, some seriously, after ingesting the substance provided by Lonergan. A few of these students were transported to the hospital.   Some of these students swallowed the capsule, and others opened the capsule and snorted the powder.   Those who had an adverse reaction felt it immediately, within fifteen minutes of ingesting the substance.   These students described a feeling of either extreme lethargy or an irrational fear of everything and everyone around them.   One student who snorted .05 grams of the substance passed out within ten minutes, remained bedridden for two days, and was eventually transported to the hospital when her condition did not improve.

After the September 2014 overdoses, Lonergan sent electronic communications to several students assuring them that the substance he provided to them was indeed MDMA. In one communication, he reassured the student by claiming to have obtained the drug from a prestigious chemist. He even provided the students with a video purporting to show him testing the substance and receiving a positive indicator for MDMA. One of the students who became ill at the September 13, 2014 party saved one of the capsules she had purchased and turned it over to the Middletown Police in February 2015.   A lab test on the contents of that capsule revealed that it did not contain MDMA, but contained two other controlled substances: AB Fubinaca, a Schedule I controlled substance, and 6-MAPB, an analogue of MDMA.

After the September 2014 overdoses, Lonergan continued to provide students with MDMA at Wesleyan.   He did so in bulk quantities, not in individual capsules.   As to Kramer, he sold him quantities of MDMA in as little as ten-gram increments and as much as 45-gram increments.   Kramer then separated the MDMA into smaller quantities and re-sold it to students at Wesleyan.   In fact, in or about December 2014, Kramer took over for Lonergan as the primary supplier of MDMA at Wesleyan.   Kramer would sell the MDMA in 0.1 gram quantities for $20 each or he would sell it in five- and ten-gram quantities for a discount, charging between $100 and $200 per gram, depending on the customer and the quantity. Though Kramer initially paid $100 per gram to Lonergan, he soon started paying $80 per gram to Lonergan.

In or about January 2015, Kramer purchased approximately 45 grams of MDMA from Lonergan.   He broke that quantity into 5 and 10-gram bags and distributed those bags to other students who planned to break down the MDMA into .1 gram capsules, sell those capsules to other Wesleyan students and re-pay Kramer for the bulk quantity of MDMA he had provided to them. Kramer re-distributed approximately 30 of the 45 grams he had obtained from Lonergan.

On February 21, 2015, eleven individuals, including ten Wesleyan students, overdosed on a substance they believed was MDMA, and many were transported to the hospital.   Two of the students were in critical condition, and one of those students had to be revived after his heart stopped. Indeed, it was Kramer himself who administered CPR to this student and helped keep him alive until the

6

paramedics arrived.   The student, Abhi Janamanchi, was Kramer's good friend and one of the individuals to whom he had provided a bulk quantity of MDMA for re-sale.   Janamanchi would later be arrested on state drug charges, along with Kramer, Lonergan, Al Nakib, and Andrew Olsen (who had obtained MDMA in bulk from Kramer and redistributed it to some of those who overdosed).   All of the students who overdosed in February 2015 obtained the purported MDMA through individual distributers who were supplied directly by Kramer, and Kramer obtained these drugs from Lonergan.

After the overdoses, Kramer contacted all of the individuals to whom he had provided MDMA, asked them to check on their customers and directed them to destroy any of the substance that remained.   He met with some of them personally and warned them not to talk to the police.   He also sent several text messages to friends denying that he had any involvement in the distribution of the substance that caused the overdoses and attempting to place blame on others, including Janamanchi, who was hospitalized and in critical condition as a result of ingesting the Molly.   Although Kramer and some of his distributers destroyed the remaining Molly that they had in their possession, Janamanchi could not, as he was in the hospital, and the police seized about four grams of that substance from his backpack and sent to the toxicology laboratory for testing.   Laboratory analysis confirmed that the powdered substance contained AB Fubinaca, a Schedule I controlled substance. In addition, blood tests for all of the individuals who were hospitalized for the overdoses revealed the presence of AB Fubinaca, which is a

7

synthetic cannabinoid.

Olsen, who had been off campus in Boston, found out about the overdoses when Lonergan called him and told him about it. At that point, Lonergan did not say anything about the source of the Molly. A few days later, Olsen would go to Lonergan's room and talk to him about the overdoses. At that point, Lonergan told him he had gotten the Molly over the internet from a person known as "Sterling" from Northwestern University. Lonergan claimed to have spoken to this source after the overdoses and that the person was "freaked out" by what had happened. Long before the February 2015 overdoses, Lonergan had told Al Nakib a similar story about his source, that he was a chemist at Northwestern known only as Sterling.

Lonergan was arrested on state drug charges on February 24, 2015.   At that time, the police interviewed him at the Middletown Police Department.   He waived his *Miranda* rights and agreed to talk to them.   He admitted to extensive drug use at Wesleyan and acknowledged that other students viewed him as an expert on pharmacology.   He said he was known on campus as "Eric Drugs." He regularly advised other students on how to take certain drugs and wrote a manual with instructions on how to ingest various different kinds of drugs. He also admitted that he regularly tested drugs brought to him by other students and then offered suggestions based on what the tests showed. As to the February Molly overdoses, Lonergan denied knowing anything about what had happened, but discussed Olsen, Kramer and Al Nakib. In particular, he said that Kramer and Al Nakib were

8

selling MDMA during the prior semester at Wesleyan.   He also claimed that, prior to the February overdoses, Kramer had sold MDMA to Janamanchi, who had distributed it to other students. According to Lonergan, Olsen had also distributed MDMA to students who later overdosed. He never acknowledged or admitted that he was the source of MDMA at Wesleyan or that he was the source for the tainted MDMA that caused the overdoses in February.

The police specifically asked Lonergan about the alleged source at Northwestern University (a story Lonergan had told several others). He said he suspected that a chemist at Northwestern known only as "Sterling" likely shipped the MDMA to Kramer and Olsen.

In total, between November 2013 and February 2015, Lonergan re-distributed more than 80 grams, not more than 120 grams, of purported MDMA to other students at Wesleyan. He did not obtain the MDMA (which was actually a mix of 6-MAPB and AB Fubinaca) from a chemist at Northwestern, but instead ordered it from a company over the internet.   In total, he reaped approximately $14,000 worth of profits from his drug operation. And, between September 2014 and February 2015, Kramer re-distributed approximately 80 grams of purported MDMA that he had obtained from Lonergan.

The Pre-Sentence Report ("PSR") found that the base offense level, under Chapter Two of the November 1, 2015 version of the Sentencing Guidelines, was 18 because Lonergan was involved in distributing between 80 and 120 grams of MDMA.   *See* PSR ¶ 23.   Two levels were added because Lonergan sold MDMA at

Wesleyan, which is a private college. *See* PSR ¶ 23.   And two levels were added because Lonergan was an organizer, leader, manager or supervisor in the offense. *See* PSR ¶ 26.   After a three-level reduction for acceptance of responsibility, the total offense level is 19.   *See* PSR ¶¶ 30-32. Lonergan has no criminal history and falls into Criminal History Category I. *See* PSR ¶ 37. As a result, he faces a guideline incarceration range of 30-37 months' incarceration.   *See* PSR ¶ 74.

Lonergan still has one case pending in state court.   After his initial state arrest and expulsion from Wesleyan in February 2015, he returned to campus on April 18, 2015 for a festival.   The PSR describes the arrest as follows:

> An arrest report dated April 18, 2015 indicates Middletown police were contacted by Wesleyan Public Safety indicating a former student, Mr. Lonergan, was on university property. Mr. Lonergan had previously been expelled from the university, for the conduct in the instant offense, and advised not to return to university property. He had been observed by university staff at a festival being held on campus. Subsequently, staff addressed Mr. Lonergan and asked him to leave while also contacting the public safety officer. Later, Mr. Lonergan was observed walking by public safety officers toward Main Street in Middletown. The public safety officers asked Mr. Lonergan to stop. He failed to comply with their request and informed the officers he was exercising his right to walk on the street. He then proceeded to jog away from the officers and was eventually stopped with the assistance of Middletown police officers on Main Street in Middletown. The public safety officers asked that Mr. Lonergan be arrested for trespassing as he was given both verbal and written notice not to come back onto Wesleyan University property. Consequently, Mr. Lonergan was arrested and during interaction with Middletown police he stated he had made a "bad judgment call" by returning to campus. Further, officers noted he was relatively cooperative.

PSR ¶ 40.

Lonergan has made a voluminous sentencing submission, including a 90-

page sentencing memorandum, numerous letters of support from friends, family members, and professors, and a psychiatric report.   Like his co-defendant Kramer, he asks the Court to vary from the guidelines and impose a sentence of probation.   In support of this request, he emphasizes his personal acceptance of responsibility in this case, his mental health history, the positive steps he has taken since his arrest to give back to the community, and his goals for his future.   Like Kramer, he blames his offense conduct on his misguided attempts to help others by offering them guidance, support and access to chemicals he thought could be therapeutic and beneficial to them.

Though the government continues to disagree with Lonergan's characterization of his offense conduct, it does not challenge the various mitigating factors he discusses in his extensive sentencing submission.   And there is no doubt that the impact of this prosecution alone on Lonergan and his family has been significant. Defense counsel has done everything in their power to present Lonergan in a positive light and convince the Court that an incarceration term is simply not necessary to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a). The government recognizes that Lonergan has changed. He is not the same person who distributed a dangerous drug to his fellow students for much of his Wesleyan career. Since his arrest, he has volunteered his time both to tutor children and make presentations to students about the dangers of drug use and abuse.   Like Kramer, Lonergan is an extremely intelligent and talented individual who can and will contribute so much to his community.   His friends and family

universally describe him as someone who is kind and compassionate and always puts the needs of others before himself.

The fact remains, however, that he engaged in a very serious offense.   He was the source of Molly at Wesleyan for over a year. He was the source of Molly for two different parties, one in September 2014 and the other in February 2015, each of which involved multiple overdoses and hospitalizations.   The drug that he distributed very nearly caused the death of two college students.   He had fair warning in September 2014 that the drug he was importing and distributing was dangerous, but chose to ignore that warning.   In fact, in response to a campus-wide email from administration warning students about the dangers of MDMA, Lonergan created and distributed his own pamphlet touting the benefits of psychedelic drugs and giving advice on how to consume these drugs. Also, Lonergan's motive for distributing the drug was purely financial.   He was a drug dealer.   He was purchasing the Molly for about $20 per gram and selling it for about $200 per gram.   He made over $14,000 from his sales.   Based on the extremely serious nature of his offense, the number of overdoses that resulted from his drug distribution and his willingness to continue selling the dangerous drug even after learning that it was causing students to be hospitalized, the government is compelled to seek a sentence within the guideline range set forth in the PSR, though one at the bottom of that range.

As the government pointed out in its memorandum for Kramer's sentencing. There is a larger story here.   Talented and gifted college students at a highly

selective private college are engaging in risky and destructive behavior for reasons that are almost impossible to comprehend.   Whereas the government asserted that "Kramer was at the center of this storm," Lonergan was more than that.   He was the source of supply. There was no mysterious chemist at Northwestern sending MDMA to Wesleyan.   It was Lonergan alone.   He was importing this dangerous drug, thinking that he was purchasing a high-quality and powerful analogue of MDMA. He convinced his fellow students to trust him. And they did. Even after the overdoses, as this investigation proceeded, students who had purchased and used the substance refused to believe that it had been Lonergan who had brought the drug to campus.   They viewed him as a drug expert. They trusted his judgment.   Many still cannot believe he bears any fault in this case.

## II.   DISCUSSION

After the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-245 (2005) rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence."   *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).   The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the

offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.   *See* 18 U.S.C. § 3553(a).

In the government's view, the primary consideration in this case, under § 3553(a), is the very serious nature of this offense.   Lonergan was responsible for distributing an extremely dangerous substance to his fellow students at Wesleyan. What occurred in September 2014 and February 2015 has been described as "overdoses," but that term is really a misnomer. The students who used the MDMA that Lonergan distributed did not overdose. It was more like a poisoning.   For many of these students, they ingested the smallest amount of the drug (less than .1 gram) and succumbed immediately.   In fact, for one of the students who overdosed in September 2014, she snorted about .05 grams of the substance and almost immediately became incapacitated.   It would take her several days to recover, and she would eventually have to be transported to the hospital as her condition worsened. The very idea that so many students could need medical help in one night in February 2015 is highly disturbing, especially considering the fact that this occurred on the campus of one of the most selective colleges in the

country.

In addition, as set forth above, Lonergan was very much a traditional drug dealer.   Though defense counsel would likely not agree with this characterization, Lonergan's actions wholeheartedly support it.   He was the source.   He imported the dangerous substance on campus.   He controlled the distribution of it.   He set the price.   He selected his distributers and dictated how they would sell it.   For example, in September 2014, he refused to allow Al Nakib to sell the Molly in gram increments or to set her own per-gram price for the substance. In text messages to her phone, he directed her what price to charge and told her that anyone who wanted to purchase one gram or more at a time would have to come directly to him. He regularly conducted presumptive field tests on the substance to prove to students that he was selling them high-quality MDMA. He also lied to them and told them he was getting the MDMA from a prestigious chemist at Northwestern.   He did not want them to know he was selling them a cheap analogue he had purchased over the internet.

And the most aggravating factor about the offense conduct is Lonergan's willingness to stay in business after the September 2014 overdoses. There is no dispute that he knew the full extent of the overdoses. He and Al Nakib exchanged text messages with the most seriously affected victim, trying to convince her not to go to the police and trying to show her that the drug she purchased was safe. Lonergan sent her a video of him testing the substance to show it was MDMA and told her that her overdose was caused by the fact that she had snorted the drug

instead of swallowing it. Because this victim did not trust him, she saved the extra capsule of MDMA she had purchased and later turned it over to the police, allowing investigators in this case to conclusively tie the substances sold in September 2014 and February 2015 to one common source (Lonergan).

And, perhaps even more disturbing, Lonergan created and distributed a pamphlet, titled "A Manuel of Psychedelic Etiquette and Safety," to the Wesleyan campus about the "safe" ingestion of psychedelic drugs. This four-page, single-spaced writing touts the "psychedelic experience" as a "bombastic burst of novelty, an adventure into vast unchartered territories of mind" which "hold the potential to break barriers, build bridges and erect momentous monuments of meta-apprehending consciousness." It counsels readers through three stages: "the premeditation, the experience and the aftermath." It also reviews approximately thirteen different substances, describing the effect of taking each one.

In describing his substance use history, Lonergan discussed his increasing use of "psychedelics" at Wesleyan. As the PSR recounts,

> He reported his distaste for recreational use of psychedelics was the motivation for the pamphlet he created that circulated through the Wesleyan University campus. He indicated the pamphlet was a collection of his online research and related information on how to safely use psychedelics and MDMA. He indicated it was distributed to other students who shared similar philosophies of the beneficial use of psychedelics. Further, he explained his belief of the adverse reactions by other students using MDMA was because of the manner in which they took the substances.

PSR ¶ 61. In short, Lonergan believed at the time, and continued to believe even up

to the indictment in this case, that the Molly and research chemicals he distributed to students had beneficial effects and could be used safely.

Lonergan tries to distinguish himself from Kramer on two main points. First, he claims that Kramer is the source for the February 2015 overdoses. Second, he claims that Kramer obstructed justice after the February 2015 overdoses by telling his distributers to lie to the police and destroy any remaining drug they had. On both of these points, the government cannot agree.

It should be undisputed that Lonergan, not Kramer, was the source for the February 2015 overdoses. It was Lonergan who imported the deadly drug in large volume in or about January 2015 and distributed 30 grams of it to Kramer. Again, Lonergan was the source and set the price.   So, for example, to the extent that Janamanchi distributed Molly to another student who overdosed (a charge he faces in state court), he received that Molly from Kramer, who had purchased it from Lonergan. Without Lonergan as the source, the overdoses in February 2015 simply do not occur. Kramer had no idea where Lonergan was obtaining the drug and no ability to import it on his own.

And Lonergan's conduct in February 2015 was no less reprehensible than Kramer's.   Lonergan knew he was the source of the tainted Molly and destroyed the 15 grams of it he still had to avoid getting caught. In addition, when the police arrested and interviewed him in the immediate aftermath of the overdoses, he lied to them. He placed the blame for the overdoses on Kramer, Olsen and Janamanchi. He claimed that they had been selling it on campus, along with Al Nakib. He even

17

went so far as to suggest that Kramer and Olsen had been using a chemist source at Northwestern. In other words, when given the opportunity within days of the February 2015 overdoses to take responsibility for his actions and turn over the Molly that he still had (at a time when the police had no idea the substance contained AB Fubinaca), Lonergan chose to lie about his involvement and do exactly as Kramer had done: place blame onto his friends and fellow students.

Compare Lonergan's actions to those of the student who had overdosed in September 2014.   As soon as she found out about the February 2015 overdoses, she turned over a capsule of suspected MDMA that she had kept since her own overdose. Risking arrest and acting against enormous pressure from her fellow students (including Al Nakib), she turned this capsule over in the hope that it could be useful to the police and help those in medical distress.   And it did help. The lab test of the substance in the capsule revealed that it contained AB Fubinaca, a different controlled substance.   That same substance was present in the powder found in Janamanchi's backpack, thus solving the mystery. The substance that Kramer sold to his fellow students, which he bought from Lonergan, was not MDMA; it was a synthetic cannabinoid, and it was nearly lethal.

At Kramer's sentencing, the Court did not apply the safety valve reduction and found that the guideline incarceration range was 18-24 months.   It then imposed a 12-month sentence, requiring 4 months to be served in jail and 8 months to be served in home confinement.   In the government's view, Lonergan's higher guideline range of 30-37 months accurately reflects the difference between the two

men. First, as set out above, Lonergan, not Kramer, was the source of supply for Molly at Wesleyan for over a year.   He distributed Molly to students across campus. Prior to September 2014, he sold Molly directly to students. After September 2014, he sold it through students such as Al Nakib and Kramer.   So, his guideline range appropriately reflects a higher quantity than Kramer's. Second, Lonergan was undoubtedly the leader of this enterprise and, for this role, received an enhancement.   He was the source; he set the price; he controlled every aspect of the distribution. In fact, after the September 2014 overdoses, he decided he no longer trusted Al Nakib and felt she was not being responsible in how she distributed the substance, so he stopped providing Molly to her and started providing it to Kramer.

Like Kramer, Lonergan has raised some strong arguments in support of his request for probation. Those arguments relate to his efforts at rehabilitation since his arrest, his struggles with substance abuse and his previously undiagnosed mental illness.   But these arguments cannot overcome the nature and seriousness of his offense conduct.   This was a very serious offense, and it was committed by someone who had little justification for it.   Unlike so many drug defendants who come before the Court, Lonergan (like Kramer) has always had a loving and supportive family.   He enjoyed a strong relationship with his parents. *See* PSR ¶ 47. Though he experienced bullying in middle school in Brazil, his parents helped him through this period, and he had a positive transition to high school. *See* PSR ¶ 46. Many of the family members who submitted letters for

Lonergan have been extremely successful in their chosen fields. His family is most impressive with the depth and breadth of their experiences.   Lonergan himself is a gifted, intelligent and well-educated individual with enormous potential.   He was given every advantage in life. Even his voluminous sentencing presentation to the Court stands in stark contrast to the typical sentencing memorandum filed in a drug distribution case. And despite all of this support and all of these advantages, he decided to spend much of his time at Wesleyan serving as "Eric Drugs," the self-appointed drug guru who could counsel students on various controlled and uncontrolled substances and, at the same time, run a lucrative drug distribution business.

As with Kramer, it appears that, in Lonergan's eyes, Wesleyan bears some blame for his offense.   He described the community as full "of many people with social difficulties" and "underlying depression." His mother spoke of the school's "systemic" "drug culture." PSR ¶ 50. She feels that the school "could have provided more support to the entire student body and failed to take advantage of opportunities that were available to the administration." PSR ¶ 50. But it is hard to distinguish Wesleyan from any other highly competitive college in which talented and stressed students try, often for the first time, to survive on their own and figure out what careers they want to pursue. Wesleyan is not to blame for Lonergan's actions.   Lonergan bears the blame and was the conduit for so many of these students he characterized as having social difficulties and suffering from depression. All the good that he has done since his arrest, and the difficulties he

20

has faced throughout his life, do not excuse or erase his offense conduct.   Despite being enrolled at a highly competitive college, and despite being well-equipped to excel there, Lonergan became a lucrative drug dealer.   He imported a deadly substance and distributed it widely, with devastating effect.

Moreover, general deterrence is an important factor in this case.   Despite this highly publicized prosecution and a Rolling Stone article that received wide attention, very little changed at Wesleyan.   In October 2015, another Wesleyan student very nearly died after ingesting a highly toxic synthetic drug distributed by a player on the football team.   A three-month investigation revealed that this player, Ryan Welch, obtained this synthetic hallucinogen off the darknet, using bitcoin currency he obtained through cash MoneyGram purchases at a Rite Aid. He then distributed the drug, in capsules, to approximately 15 members of the football team.   *See United States v. Ryan Welch*, 3:16cr49(VAB). Welch is due to be sentenced on August 30, 2016.   Ironically, the substances distributed by Welch (2C-B and 2C-E) are specifically mentioned in the pamphlet distributed by Lonergan in 2014.

The message apparently is not getting through that these synthetic drugs are highly toxic and that their sale carries serious consequences. A sentence of probation for Lonergan will do nothing to reinforce this idea.   Synthetic drugs are extremely dangerous.   Their use and re-distribution has the potential to cause serious bodily harm for any who ingest them. The sentence here should, at a minimum, send a message that the distribution of these drugs, especially when

21

they actually cause serious bodily injury to multiple people, will carry serious consequences.

III.   <u>**CONCLUSION**</u>

For the reasons stated above, the government respectfully asks the Court to adopt the factual findings in the PSR, find that the guideline incarceration range in this case is 30-37 months' incarceration and impose a sentence at the bottom of that range.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/ *Robert M. Spector*
ROBERT M. SPECTOR
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT18082
157 CHURCH STREET; 23rd FLOOR
NEW HAVEN, CT 06510
203-821-3700

## C E R T I F I C A T I O N

I hereby certify that on August 26, 2016 the foregoing Sentencing Memorandum was filed electronically.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.   Parties may access this filing through the Court's system.

/s/ *Robert M. Spector*
**ROBERT M. SPECTOR**
**ASSISTANT UNITED STATES ATTORNEY**

23